**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Luke Sironski-White (State Bar No. 348441)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com
        lsironski@bursor.com

**LYNCH CARPENTER, LLP**
Todd D. Carpenter (State Bar No. 234464)
todd@lcllp.com
Scott G. Braden (State Bar No. 305051)
scott@lcllp.com
James B. Drimmer (State Bar No. 196890)
jim@lcllp.com
1234 Camino Del Mar
Del Mar, CA 92014
Telephone:  (619) 762-1910
Facsimile:  (858) 313-1850

*Attorneys for Plaintiff and Proposed Class Counsel*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| B. D., L. M., D.H., and E.L., individually and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>     v.<br><br>MIT45 INC.,<br><br>               Defendant. | Case No. 24-cv-00499-L-DEB<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiffs B.D., L.M., D.H., and E.L. ("Plaintiffs")[1] bring this action on behalf of themselves, and all others similarly situated, against MIT45 Inc. ("Defendant").

## NATURE OF THE ACTION

1.     This is a civil class action lawsuit against Defendant MIT45 Inc., for false, misleading, deceptive, and negligent sales practices regarding its kratom powder, capsule, gummy, and liquid extract products (the "Products").[2]  Kratom is a type of plant indigenous to Southeast Asia which can produce psychoactive effects when ingested.  Dried kratom leaves are sold as a loose powder, packaged into gel capsules, or made into an extract.  However, what reasonable consumers do not know, and Defendant fails to disclose, is that the "active ingredients" in kratom are similar to opioids.  That is, kratom works on the exact same opioid receptors in the human brain as morphine and its analogs, has similar effects as such, and critically, has the same risk of physical addiction and dependency, with similar withdrawal symptoms.

2.     When reasonable consumers think of opiates and opioids, they think of heroin, fentanyl, hydrocodone, oxycodone, and morphine; they do not expect that the "all natural" product bought at their local corner store operates like an opioid, with similar addiction and dependency risks.  Kratom is perniciously addictive—on a whole different level than caffeine or nicotine—and it has sunk its hooks into tens of thousands of unsuspecting consumers and caused them serious physical, psychological, and financial harm.  Defendant intentionally and negligently failed to disclose these material facts anywhere on its labeling, packaging, or marketing

---

[1] Because this action concerns issues of addiction and medical status, Plaintiffs are filing under their initials for the sake of their personal privacy. Plaintiffs are reasonable consumers who fell victim to Defendant's omissions and misrepresentations about the addictive nature of kratom, which operates like an opioid, and became addicted as a result. Since addiction issues are still wrongly stigmatized, Plaintiffs are filing this matter anonymously but will reveal their names as necessary to the Court under seal.

[2] Specifically, this includes Defendant's MIT45 "Gold," "Go," "Super K," "Super K Extra Strong," and "Ultramit" extract shots; Defendant's MIT45 "Boost Bites" gummies; and Defendant's MIT45 "Black Label" capsules.

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

materials, and it has violated warranty law and state consumer protection laws in the process.

3.    Defendant relies on its Products' innocuous packaging and the public's limited knowledge about kratom and its pharmacology to get users addicted, while reaping profits along the way.  Reasonable consumers do not expect the liquid extract bottles, gummies, and pouches of kratom powder, which they can purchase at gas stations and corner stores, to perform like an opioid with the same addictive potential of morphine and its analogs.  Defendant relies on this ignorance and does nothing to correct it.  Such activity is outrageous and is in contravention of California law and public policy.

4.    Defendant has engaged in a systemic effort to peddle an addictive substance to unsuspecting and oftentimes vulnerable consumers.  Plaintiffs seek relief in this action individually, and as a class action on behalf of similarly situated purchasers of Defendant's Products, for: (i) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (ii) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civil Code §§ 1750, *et seq.*; (iii) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; (iv) violation of Oregon's Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605, *et seq.* (the "UTPA"); (v) New York Consumer Protection from Deceptive Acts and Practices Act, N.Y. GBL § 349, *et seq.* (the "NYDAPA"); (vi) New York False Advertising Act, N.Y. GBL § 350, *et seq.* (the "NYFAA"); (vii) breach of implied warranty; (viii) unjust enrichment; (ix) and fraud by omission.

## **PARTIES**

5.    Plaintiff B.D. is a citizen of California who resides in San Diego, California and intends to stay there.

6.    Plaintiff L.M. is a citizen of California who resides in Oroville, California and intends to stay there.

2

7.     Plaintiff D.H. is a citizen of New York who resides in Gansevoort, New York, and intends to stay there.

8.     Plaintiff E.L. is a citizen of Oregon who resides in Portland, Oregon, and intends to stay there.

9.     Defendant MIT45 Inc., is a Delaware corporation with its principal place of business in Salt Lake City, Utah.

10.    Plaintiffs reserve the right to amend this Complaint to add different or additional defendants, including, without limitation, any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, and/or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

12.    This Court has personal jurisdiction over the parties because Plaintiffs B.D. and L.M. reside in California, are citizens of California, and submit to the jurisdiction of the Court, and because Defendant has, at all times relevant hereto, systematically and continually conducted, and continues to conduct, business in this State.  Defendant therefore has sufficient minimum contacts with this state, including within this District, and/or intentionally availed itself of the benefits and privileges of the California consumer market through the promotion, marketing, and sale of its products to residents within this District and throughout this State.  Additionally, Defendant marketed and sold its kratom to Plaintiffs in this District.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant regularly does business in this District, and the same misrepresentations, omissions, and injures giving rise to the claims alleged herein have occurred in this

District (e.g., the distribution and sale of Kratom to Plaintiffs, and Plaintiffs' subsequent addiction to kratom).

## **FACTUAL ALLEGATIONS**

**Background and Pharmacology of Kratom**

14.  Kratom is a drug[3] which is derived from the kratom plant, *mitragyna speciosa*, indigenous to Southeast Asia, where it has been used in herbal medicine since at least the early 19th Century.  Use of the plant has been particularly well-documented in Thailand, Indonesia, and Malaysia, and it remains popular in each of those countries to this day.  Kratom is the most widely used drug in Thailand, for example.

15.  The first reported use of kratom in scientific literature dates back to 1836 when it was noted that the leaves of the tree were used by Malays as a substitute for opium.

16.  The plant's leaves are harvested, dried, and crushed into a fine powder which is then packaged, either straight into a pouch or in capsules, and sold by manufacturers like MIT45.  The drug can also be extracted into a liquid formulation, colloquially called a kratom "shot."

17.  In the West, kratom is sold through the Internet and at herbal stores, gas stations, corner stores, smoke shops, and "head" shops where it is primarily marketed as an herbal medicine or supplement to treat a variety of ailments (*e.g.*, pain, mental health, opioid withdrawal symptoms), as well as a "legal" or "natural" high by some manufacturers.

18.  The chemicals in the plant that produce a psychoactive effect when ingested are called "alkaloids."

---

[3] Kratom is unregulated by the FDA, so the usage of the word "drug" here is meant in the colloquial sense, rather than as a defined term under the Food, Drug, and Cosmetic Act.

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

19.    The primary alkaloids in kratom plant leaves responsible for the kratom "high" are <u>Mitragynine</u>[4] ("MG") and <u>7-hydroxymitragynine</u> ("7-MG").

20.    MG and 7-MG exhibit a wide variety of pharmacological effects, resulting in a highly dose-dependent response.  For example, a low dose (0.5 grams to 3 grams) of kratom is typically described as stimulating or energizing, whereas a high dose (3+ grams) is described as euphoric, sedating, and analgesic.  On the whole, however, kratom's high is not overwhelming like it would be for a "hard" drug like cocaine or heroin—it is somewhat more subtle, but its effects are nonetheless substantially similar to opiate-based painkillers such as hydrocodone and oxycodone in sufficient dosages.

21.    Kratom's variable but not debilitating effects have always been part of its appeal.  For instance, the use of kratom in Southeast Asia has been documented back for at least 150 years and the earliest accounts described both a stimulant effect for use in hard day-labor when fresh leaves are chewed, and an analgesic and relaxing effect if brewed into a tea.

22.    MG and 7-MG produce such a wide spectrum of effects because they interact with many different receptors in the brain.  Studies have shown that MG and 7-MG interact with alpha-2 adrenergic receptors (adrenaline), D2 dopamine receptors, and the serotonin receptors 5-HT2A and 5-HT2C, all of which contribute to the drug's mood-lifting and stimulant-like effects.

23.    Most crucially, MG and 7-MG also interact with the mu-opioid receptor.

24.    The mu-opioid receptor is known as "the gateway to addiction" because it is the receptor which all opiates/opioids interact with to produce the classic opiate high: euphoric, sedating, and analgesic.  This means that MG and 7-MG interact with the primary receptor that heroin and oxycodone interact with.

25.    There are other opioid receptors, but the mu-opioid receptor produces the most "hedonic" or habit-forming effects such as euphoria and analgesia.

---

[4] Pronounced "Mitra-Guy-Neen."

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

26.    Mitragynine and 7-hydroxymitragynine were found to be more potent to the mu-opioid receptor than morphine via oral administration; 7-MG in particular is 17 times more potent than morphine, though the actual effect of kratom is dose-dependent, as discussed above.

27.    Kratom is therefore considered by health professionals to be similar to an "opioid" and a "quasi-opiate."

28.    The notion that kratom is substantially similar to an opioid, and a quasi-opiate, is reaffirmed by a few facts.  First, kratom's effects are very similar to those of other opioids.    Second, when administered, kratom alleviates opioid withdrawal symptoms.    Third, repeated use of kratom in itself results in opioid withdrawal symptoms.

29.    All substances which act on the opioid receptors carry a very high risk of addiction, and kratom is no exception.

30.    Addiction occurs when an opioid is ingested on a regular basis.  Over time, the user develops a tolerance to the drug, requiring increased dosages to get the same effects as a lower dose used to have.  As the dosages go up, the body becomes dependent on some amount of the drug to feel normal.  When the drug is suddenly taken away, the user feels much worse than before they started taking the drug: this is what is known as withdrawal.

31.    Opioids are addictive not just because of the pleasurable effects that they produce, but because sudden cessation of opioid use causes severe withdrawal symptoms, which users feel compelled to avoid by taking more of the drug.  The tragedy of addiction is that users want to stop, but they cannot.

32.    The symptoms of kratom withdrawal are very similar to those of traditional opiate withdrawal.  Such symptoms include: irritability, anxiety, difficulty concentrating, depression, sleep disturbance including restless legs, tearing up, runny nose, muscle and bone pain, muscle spasms, diarrhea, decreased appetite, chills, inability to control temperature, and extreme dysphoria and malaise.

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

33.    Users typically start substances like kratom because of how good it makes them feel, but once addicted, they use them to avoid the pain of withdrawal.  It no longer is about getting high, but about not feeling "sick."

34.    With kratom in particular, users note that the addiction sneaks up on them, and that it feels as though, over time, the color has been sapped from their lives. Long term users of kratom have reported experiencing depression, anxiety, anhedonia, and reduced sex drive.

**Kratom Use and Addiction in the United States**

35.    Kratom use in the United States has exploded over the past decade.  As of 2021, the American Kratom Association estimates that kratom is a 1.3 billion dollar a year industry, with 11 million to 15 million annual users in the United States.

36.    Other studies have found that about 1 million people use kratom in the United States every month.  Two-thirds of those users use kratom daily.

37.    Kratom's popularity can be attributed to a number of factors: first, it is often marketed as a safe substitute for painkillers and appeals to those who equate "natural" with "safe;" second, it has received attention from the media as a "nootropic" or "smart" drug because it is stimulating at low doses; third, its popularity has grown simply because it is so widely available, it produces a pleasurable high, and it is unregulated; finally, users are not aware that it is similar to an opioid with opioid addiction potential.

38.    On the whole, however, kratom is a relatively unknown drug to the average consumer.  Most people in the United States have never heard of it.

39.    The advertisements and commentary about kratom say that it is like a substitute for coffee, a pain reliever, a treatment for opioid withdrawal, an antidepressant, an anti-anxiety supplement, that it improves focus and gives users a boost of energy to get through the day.  These advertisements universally espouse the purported benefits that kratom use can provide, without disclosing that the drug is similar to an opioid with the addictive potential of one.

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

40.     What's more, because kratom does not produce a debilitating "high" like cocaine or heroin, it is very easy for users to take the drug every day without feeling as though they are developing a drug addiction or harming themselves.  This makes kratom a particularly insidious drug because addiction can sneak up on unsuspecting users and can hold them in its grip despite their best efforts to stop using.  The advertisements and word-of-mouth disclosures do not make this clear to consumers.

41.     Because manufacturers and advertisers of kratom, such as Defendant, do not disclose the addictive potential of this drug, many users have found themselves blindsided when they wake up one morning in the throes of withdrawal after having stopped using what they thought was an innocuous supplement.  They then discover just how painfully dependent they have become on kratom.  Because kratom is relatively unknown in the United States, many did not know where to turn for resources and aid.  Some users come together on the Internet to share their experiences and support each other as they attempt to get off the drug.  There are even well-populated and very active Internet forums serving as support groups for those struggling with and recovering from kratom addiction.

42.     The reports from users who have fallen into addiction, or succeeded in escaping the drug's grasp, are heart-wrenching.  Consistent amongst these reports is the initial shock that users felt when they realized they had become unwittingly addicted, and just how difficult it was for them to stop.  Below are just a few accounts from the "Quitting Kratom" forum on www.reddit.com, which had 41,000 members as of February 2024:

> About 4 months ago, a user wrote: "OK, **so mit45 shots. All I can say is be careful**. I was taking these shots about 1 every two to three days. After a few months, my back (kidneys) started hurting and getting worse! So I decided it's time to stop, and yes, the withdrawals are real. Another side effect I have, along with the kidney issues now, is that 5 days post withdrawal is gut issues and bad diarrhea like the worst bial coming out. I'm not sure if I spelled bial correctly, but it was nasty. That comes and goes with constipation and gut pain. Their is research that

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

shows it can cause severe liver and kidney damage on high doses over long periods but can be reversed when stopped and some diet changes. Going through the worst part now, I think, wish me luck! I can tell you I will never touch that stuff again! Good luck to you all..”

About 8 months ago, one user wrote: “I’ve been on a 50gpd [grams per day] habit for about 4 years. Like most people here, **I was in denial that the Kratom was causing my multitude of issues. How could it be the Kratom when everyone keeps telling me how great it is?** I made myself believe that I had underlying issues that the Kratom was helping. Spoiler: It wasn’t. **I slowly became a shell of the person I used to be. TRUE clinical depression symptoms with zero joy in my life.** I started browsing this subreddit and reading everyone’s stories and I related to every single one. Everyone had the same exact experience I had and at that moment I knew it was the Kratom causing my depression.” (emphasis added).

About 2 years ago, a gas station employee wrote: “I work at a gas station where we sell kratom such as powders, gold and silver pills and especially shots etc (you know which one I’m talking about) **it’s just mind blowing to me how many people are practically addicted and how many customers literally scavenge their money to pay for their daily shot**. Why are people so addicted especially to those shots.”

About 7 months ago, a user solicited “extract horror stories.” One user responded: “Took 2-3 shots a day for almost 2 years. How did it screw me up? Let me count the ways. Financially it was draining me, 100%! **I would estimate 60% of my hair fell out. My skin was grey. My eyes were dark. I became a hermit.** No longer wanted to do anything, including self care or hygiene. Just taking a shower was a chore I had to talk myself into the last few months. I was disgusting and did not care at all. All I cared about was that I had enough K for tomorrow.”

Another user responded: “Amen. This [expletive] got hold of me as bad as anything else I've ever done... spent WAY more money on these [expletive] things than real honest to God hard drugs back in the day. **Anywhere from 6-10 of these things daily for... years. Let's call it 7 at an average of $18/pop = $126/day x 30 = $3780/month = about $45k/year.** How [expletive] embarrassing. I made $140,000 last year living in Georgia (pretty low cost of living) and pretty regularly get

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

busted "borrowing" money from my 10 year old son.  [Expletive] this; I'm not living like this anymore."

About 2 years ago, another user wrote: "I saw 'A Leaf of Faith' and got the impression that kratom was a generally friendly substance to use freely, never knowing how addictive it was, how much it was further numbing me beyond how alcohol already was, how it was slowly wiping out my sex drive, and likely contributing to my perpetual brain fog. … My second attempt [at quitting] was maybe another 7 or 8 months later.  Kratom was making me pretty miserable. I was reading posts in this subreddit and I was finally aware of how addicted I was; feeling crappy, sluggish, and sorta spacey pretty much all the time."

About 2 years ago, another user wrote: "What a difficult journey it has been. I was a ~75 GPD [grams per day] user. **Quitting kratom was one of the hardest things I've had to do in my life.** I learned the hard way that kratom causes withdrawals on a work trip 3 years ago. I should have stopped then and there but I gave in because the RLS was so bad. … Kratom withdrawal is seriously no joke so don't think you're the only one struggling so much. I'm only a week free but after this experience I know for sure that I will never go back. Good luck everyone!" (emphasis added).

About 2 years ago, another user wrote a post titled *Kratom Is An Addictive Drug*.  It said, in part: "It's been 23 hours since my last dose. **I just wanted to give my story hoping that it would help others see that they've been lied to, deceived and manipulated into thinking this plant is 'harmless and safe'.** As a matter of fact, reading the horror stories on this subreddit was the first step in my recovery... I started taking it almost 3 years ago after hearing about it on... well, Reddit. They touted it is a miracle plant that had all the benefits of an opioid with none of the side effects." (emphasis added).

About 19 months ago, another user wrote: "I thi**nk the perfect word to describe Kratom addiction is 'insidious'. Here is the definition** – *'proceeding in a gradual, subtle way, but with harmful effects.'* I think this is why it takes so long to realize what is going on. There was never a rock bottom moment for me like there would be for other more conventional abused drugs. No overdose, no bad behavior, no abusiveness to my family, no DWI, etc.. - It was just a lazy, slow descent into nothingness. I was living in a groundhogs day type of

| FIRST AMENDED CLASS ACTION COMPLAINT | CASE NO. 24-CV-0499-L-DEB |

existence. Wake up, go to work, leave work, buy an extract shot or 2, have dinner, drink my shot, mindlessly look at my phone and/or watch TV. Wake up and do it all over again." (emphasis in original).

About 12 months ago, another user wrote: "I started using k[ratom] when I had knee surgery Dec 2019 so 3 years. **I didn't want to use pain killers because I got sober from alcohol 3/6/2018 and i felt the pain killers were going to make me relapse.** I didn't know I would end up in a worst place as I am now." (emphasis added).

About 2 years ago, another user wrote: "Was in bed all day yesterday fighting withdrawals. I used to even be an athlete - strong lean and fit, until I got on [kratom] shots and extracts. Didn't even get high any more - just wanted to not feel bad."

About 4 years ago, another user wrote: "I researched kratom before using it and almost every site promoted that its harmless with healthy benefits, and that its withdrawals are like coffee for 3 days max. Information wasn't clear that kratom could become a negative addiction that takes months to recover" … "I took something I thought was helping me for 1.5-2 years, not even knowing the downsides bc that information was so misleading. It [expletive] up my digestion, energy, mood, brain fog, anxiety, etc. [Expletive] kratom, and [expletive] those who peddle it as a harmless cure-all."

About 4 years ago, another user wrote: "I got out of treatment for a heroin relapse 6 months ago after a year and a half clean. **A couple months after I got out, I was at the gas station and saw the MIT 45 shots and caved. I had heard kratom wasn't addictive and had no idea what these shots were or how strong they are. Taking one mad me feel like I had taken a 30 mg oxy and used them for three days.** After only 3 days I had minor withdrawals due to my past opiate addiction (if I use opioids for 2-3 days in an row I get withdrawals bc of my past abuse). I went a week without using and relapsed again. Since then I have gotten to where I take 3 MIT 45 in the morning, and at this point I don't even feel anything from them. … I am in a bad situation because I am actively in AA, working the steps (on my amends step 9) but I haven't been able to tell my sponsor or be honest with everyone because I am so scared that **I will lose my fiancé if she knows I relapsed again, and my family will be devastated**.

FIRST AMENDED CLASS ACTION COMPLAINT                CASE NO. 24-CV-0499-L-DEB

About 10 months ago, another user wrote: "For any newcomers: this stuff is absolutely no joke. It's not harmless and the wd [withdrawal] is *definitely* **not** like caffeine. I've cold turkey'd caffeine before and I had a slight headache for a couple hours. I definitely have never woken up in a pool of my own sweat from not having my caffeine. … **This stuff is a drug. A serious drug. And it's super freakin addictive**. Extracts, powder, or in my case, capsules…it doesn't matter. Yes some forms are more addictive than others but the WD is hellacious no matter how you're taking it." (emphasis original).

About 10 months ago, another user wrote: "This stuff is a drug, and dangerous! **I started taking it because of all the good things I heard and read about it**. I've never been addicted to or dependent on anything before, but this stuff has totally taken control of my life." (emphasis added).

About 9 months ago, another user wrote: "I finally realized a few weeks ago how much of a negative impact kratom was having on my life. I noticed myself planning my whole day around my doses and making sure when I left the house I'd bring an extra dose with me in a shaker bottle. It was heavily affecting my mood overall, but especially in public settings. I did not want to leave my house most days even if I did dose."

43.    This Internet forum is filled with accounts just like these. The stories are consistent—well-meaning people who were looking to feel better, in mind body and spirit, by taking an "herbal supplement," only to end up with an opioid-like addiction.

44.    What is particularly insidious about kratom is that, at the early stages, many users are unaware of its negative side effects and its addictive potential, so when they begin to experience the malaise of addiction, they do not attribute it to the kratom. Rather, they take more of the substance thinking that it is helping them with their malaise.

45.    As these accounts make clear, the addictive potential of kratom is a material fact to reasonable consumers which would help inform their purchase and consumption decisions. Defendant's Products have no information whatsoever, that

FIRST AMENDED CLASS ACTION COMPLAINT          CASE NO. 24-CV-0499-L-DEB

kratom is similar to an opioid, is habit-forming, and that regular use will result in opioid-like dependency, with withdrawal symptoms similar to those of traditional opioids.

46.     Consumers who knew the truth about kratom may not have purchased Defendant's Products or would have paid less than they did for them.

**Defendant Knew or Should Have Known it was Selling a Highly Addictive Drug to Unsuspecting Consumers**

47.     Despite its traditional medical uses, kratom dependence has been known and observed for a long time and is well-documented in Southeast Asia, where the plaint originates and has the longest history of use.

48.     Addiction to kratom among users in Thailand, Indonesia, and Malaysia has been documented by scientists and researchers in the United States since at least 1988.

49.     Defendant operates under the brand name MIT45 (short for both "*Mitragynine*," the active alkaloid in kratom, and "*Mitragyna*," the kind of kratom plant that produces kratom leaves) and is a growing producer and seller of kratom Products in the United States.  The increasing demand for Defendant's Products and expansion into new markets, like the fitness industry, has furthered its revenue growth. In 2022, MIT45 recorded seven figures in revenue from its MIT45 Boost Product alone.[5]  But Defendant has enjoyed extensive profits for years from the sale of its addictive Products.  For example, Defendant claims to have sold over 35,000,000 units of its MIT45 Gold Extract (now just "MIT45" Extract) over the last decade.

50.     Notably, Defendant specializes in kratom extracts.  As Defendant's website notes: "MIT45 is one of the country's premier providers of kratom, featuring the finest lineup of products available on the market today."[6]  MIT45 emphasizes the safety of its Products as measured by their "purity."  For instance, Defendant's website

---

[5]   https://www.abc27.com/business/press-releases/ein-presswire/604420976/mit45-achieves-recording-breaking-year-in-2022/

[6] https://mit45.com/our-brand/

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

vaunts that it "take[s] great pride in [its trademarked] Triple Purification Process."[7] Defendant describes how its extracts are third-party tested for purity to ensure that "only products that have passed this stringent testing are made available for purchase." However, such "stringent" testing means very little when Defendant's Products, even in their "purest" forms, are harmful in themselves. Kratom's addictive properties are not filtered out by Defendant's "purification process." Moreover, Defendant's use of "safe" and "pure" are misleading and misguided since its "pure" Product is still certainly unsafe because of its potential for addiction, a material fact about its Products conveniently omitted from Defendant's website.

51.    Defendant makes no mention of its Products' addictive nature on its website nor on its Products' packaging. Instead, Defendant vaguely references how the FDA has "warned against the dangers of consuming kratom and [how] there are no safe guidelines for use as a dietary supplement" in its website FAQ without explaining what said dangers are.[8] The average consumer is not aware that the "danger" Defendant references is danger for potential addiction. On its packaging for its liquid extract and gummy Products, Defendant includes an ambiguous "Caution" label, which states "Mitragyna Speciosa Extract can be much more powerful than whole leaf Kratom powder. Read above table." What metrics or criteria Defendant uses to define and categorize the power of its Products is unclear to an average consumer from this labeling. The "table" referenced shows how much Mitragyna Speciosa and 7-MG is included in each serving, measured in milligrams. This provides absolutely no useful information to consumers, who do not know how much an arbitrary amount of relatively-unknown alkaloids will affect them. It certainly does not provide any clarity as to the amount in milligrams that may potentially lead to addiction if consumed over an extended period of time. Defendant further does not even list on any of its Products the amount of 7-MG found in each serving. Because

---

[7] https://mit45.com/faq/
[8] https://mit45.com/faq/

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

there is no warning to consumers that even the suggested serving size may lead to addiction, consumers are not put on notice that they should not consume Defendant's Products at the suggested dose on a daily basis.   This is contrary to the average consumer's actual use of Defendant's Products.

52.    Kratom extracts are a concentrated form of kratom, whereby the active kratom alkaloids (MG and 7-MG included) are distilled from the leaf powder and sold in powder or liquid preparations.

53.    The purpose of kratom extracts is to create a vastly more potent product as there is a greater concentration of MG and 7-MG, and all other alkaloids, by weight compared to regular powder kratom.   For example, a single MIT45 Black Label capsule, contains 67.5mg of mitragynine, which is equivalent to about seven grams of kratom powder when using an average mitragynine concentration of 1%.

54.    Consumers who take Defendant's extracts are exposed to significantly elevated levels of MG and 7-MG compared with those who take regular kratom.   This produces greater euphoria and "feel good" effects at first, but only leads to deeper addiction down the road.

55.    No matter what Product consumers take, they are exposed to highly concentrated forms of kratom without knowing just how addictive the extracts, in particular, can be.

56.    Upon information and belief, Defendant has interacted with growers and distributors in Southeast Asia who have disclosed the addictive nature of kratom to it. Defendant touts its direct partnership with farmers throughout Southeast Asia and how this allows Defendant control over the final product sold.

57.    Even without such interactions, Defendant has received numerous user reports about the addictive potential of kratom in the United States.

58.    Defendant describes how its extracts are manufactured in a pharmaceutical grade laboratory, which monitors the potency and consistency of its

Products.  Thus, Defendant must be aware of the interaction between MG and 7-MG (the two primary alkaloids in kratom) and the mu-opioid receptor.

59.    Defendant therefore knew or should have known that the Products it was selling were highly addictive.

60.    Despite this knowledge, Defendant has failed to disclose the addictive potential of kratom on its website or on its Products' packaging.

61.    Defendant makes no effort to disclose or warn of the addictive nature of kratom.  On its website, there is no mention at all of the potential for addiction when using kratom or Defendant's kratom Products.  This is deliberately misleading, and further no such disclaimer is made on the Product packaging in stores, where consumers are most likely to encounter Defendant's statements.  The addictiveness of kratom has been well-documented for decades and is an established fact in medical literature.  The pharmacological effects of MG and 7-MG have been thoroughly studied, and it is well-established that MG and 7-MG act on the same mu-opioid receptors in the brain as traditional opioids.  Further, there are widespread user reports and case studies of addiction and dependency issues.

62.    To reiterate, this is not an instance where the science on the effects of kratom is still up for debate.  It has been known for decades in the English-speaking world that kratom is highly addictive and has the potential to cause physical and psychological dependence in regular users.  It has been known for over a century in Southeast Asia that kratom is addictive.

63.    Consumers, however, did not have access to this knowledge for years, and to this day misinformation about kratom is rampant.

64.    For example, kratom is the most commonly used drug in Thailand.  A 2007 study found that 2.3% of people in Thailand have used kratom.  Many of those users have developed a dependence on kratom to avoid withdrawal.

65.    On information and belief, Defendant imports some or all of its raw kratom powder from Thailand and other neighboring countries.

16

66.    Under the totality of circumstances Defendant knew or should have known that kratom users can develop an addiction.  Yet, Defendant does not warn consumers about the potential risks of taking its Products.

67.    Defendant's Products' packaging, in particular, is woefully sparse.  A representative image of Defendant's Products is depicted below:



68.    On the back of each Product's packaging is a bog-standard disclaimer stating that the Product is not intended to diagnose, treat, cure or prevent any disease, and that the manufacturer is not "responsible for the misuse or misrepresentation of it's [*sic*] products."  Defendant does not explain what misuse or misrepresentation looks like.

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

69.  Defendant's kratom extract bottle labeling is substantially the same, with minimal disclosures or warnings:



70.  There is no warning to consumers that the Product interacts with opioid receptors, nor is there any warning that the product is highly addictive and that it should not be taken on a daily basis.

71.  Further, the packaging itself is innocuous.  The company logo is all that is included on the front of the packaging of the Products and is printed in clear, bold text, implying a "no frills" Product with an assumed straightforward use.  Defendant's extract bottle is reminiscent of a "5-Hour Energy" brand bottle.  Nothing about this packaging would lead reasonable consumers to believe they were purchasing compounds similar to opioids, that function on the same mu-opioid receptors in the brain.

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

72.     Reasonable consumers looking at the Products' packaging would not presume that kratom is highly addictive or that daily use would be inappropriate and lead to potential addiction to the Product.

73.     Defendant's website is sparse as well, with most of the text on each Product page dedicated to extolling either the Product's potency or "energetic" effects when consumed.  The only representations that Defendant makes about the properties of its Products are that they are "natural" made with "botanical" ingredients and an emphasis on the "purity" of the Products.  Whether an average reasonable consumer were to purchase Defendant's Products from Defendant's website or from a retailer with only the Products' packaging to inform themselves of the Product, the consumer would receive the same information.  There is no disclosure or disclaimer of the potential risks for addiction from kratom use on Defendant's website or Product packaging.

74.     Defendant's "powder" line of kratom Products contains the lowest doses of MG.  However, Defendant does not list an actual amount of 7-MG contained in each Product and instead notes how the Products contain "less than 2% of total alkaloid content."  This information is not useful to an average reasonable consumer as they are not aware of what an alkaloid is or what is an appropriate amount for consumption.

75.     Nowhere does Defendant mention that kratom presents the same addiction problems that former opioid users and other consumers would want to avoid. Those seeking help as they come off opioids may be drawn in by Defendant's statements about kratom without knowing that they risk trading one addiction for another.

76.     The consequences of this addiction are not mild: "in humans, opioid-like withdrawal symptoms have been reported following cessation of kratom use," though "the withdrawal syndrome appears to be less severe than withdrawal from morphine."

77.     While kratom withdrawal may be "less severe" than morphine withdrawal, that is hardly a seal of approval—morphine withdrawal is one of the most

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

agonizing experiences that one can endure in modern life.  And kratom withdrawal, while perhaps "less severe" than morphine withdrawal, is still an "opioid-like withdrawal" (according to the World Health Organization), with the same physical and mental symptoms.  And kratom is unquestionably addictive and habit-forming.

78.    The risk of "opioid-like withdrawal symptoms" is a material fact to reasonable consumers.

79.    As a kratom product manufacturer and distributor, Defendant occupied a position of superior knowledge to the average reasonable consumer, who likely knows next to nothing about kratom.

80.    Defendant, through its misleading advertising and its failure to disclose kratom's addictive properties on its Products' labels, relied upon the average consumer's incomplete knowledge of kratom to sell its Products and get users addicted to kratom.

81.    Defendant fails to disclose kratom's addictive potential because Defendant knows that it is a material fact to reasonable consumers which would influence their purchasing and consumption decisions, likely to Defendant's detriment.

82.    By any metric, Defendant's conduct is immoral, unethical, and contrary to California public policy.

83.    The United States is going through an opiate crisis that is shaking the foundations of our society.  Amid this crisis, Defendant is creating more addicts for no reason other than to line its pockets, without adequate disclosures of its Products' risks and through the use of false and misleading packaging.  That cannot—and should not—be allowed, at least when their conduct entails breaches of warranty and violation of state consumer protection statutes (as it does here).

**Plaintiff B.D.'s Experience**

84.    Plaintiff B.D. first heard about kratom through a smoke shop owner who did not mention the risks of dependency or addiction.  B.D. was getting clean from

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

alcohol and dealing with intense anxiety.  B.D. was looking for a natural way to help with these symptoms without risking another addiction.  B.D. did not know that kratom was addictive and had no reason to know.  He began purchasing MIT45 branded kratom extracts in 2021 in San Diego, California.  When B.D. made his first purchase, he reviewed the MIT45 Gold Extract bottle's packaging and labels, but there were no disclosures on the package that would have corrected his misunderstanding about the Product's addictive potential.  Because there were no disclosures, B.D. thought that MIT45 kratom could be consumed every day without the risk of physical dependence.

85.    B.D. eventually found himself requiring larger and larger doses.  B.D. was consuming Defendant's extract shots, which are significantly more potent.  From July 2021 through December 2023, B.D. was using MIT45 liquid extracts every day, starting with the weakest "Gold," then moving to the "Blue Super K," and finally ending with the "Purple Super K Extra Strength," which contains a whopping 360 mg of mitragynine, equivalent to about 36 grams of raw kratom leaf.  When B.D. attempted to cease using kratom he was wracked by intense physical and psychological withdrawal symptoms that were substantially similar to traditional opiate withdrawals —with symptoms including profound anxiety, deep headaches, severe gastrointestinal distress, and fatigue.  B.D. realized he was addicted to kratom in February 2022 and felt that he was being held captive by the specter of withdrawal.  Though B.D. wanted to stop, he could not.  B.D. estimates he has spent at least $25,000 on Defendant's Products.

86.    Had B.D. known that kratom was so addictive, and that cessation would be so difficult, he would never have purchased the Products.  B.D. made his purchases in and around San Diego, California.  Notably, San Diego County has made illegal the manufacturing, sale, distribution, and possession of kratom.

**Plaintiff L.M.'s Experience**

87.    Plaintiff L.M. heard about kratom through a friend, who told him it would help alleviate withdrawal from other substances without being addictive itself.  L.M

was under the reasonable, but mistaken, impression that kratom was not an opioid and that, as an all-natural supplement, it did not carry any risk of dependency. Consequently, L.M. believed that kratom was non-habit forming before he made his first purchase, and he had no reason to suspect otherwise. He began purchasing MIT45 branded extracts and capsules in September 2022 in Oroville, California. When L.M. made his first purchase, he reviewed the MIT45 packaging and labels, but there were no disclosures on the package that would have corrected his misunderstanding about the Product's addictive potential. As a result, L.M. thought that MIT45 kratom could be consumed every day without the risk of physical dependence.

88.    About eight months after he began using Defendant's Products, L.M. discovered that MIT45 kratom was, in fact, addictive, and found himself requiring larger and larger doses to stave off withdrawal. This forced L.M. to move to Defendant's more potent Products, including the Blue and Purple line of liquid extracts. All told, L.M. purchased and consumed the Black Label capsules, the Boost, Super K, Super K Purple, and MIT45 Gold extract shots. When L.M. attempted to cease using kratom he was wracked by intense physical and psychological withdrawal symptoms that were substantially similar to traditional opiates—with symptoms including manic episodes, restlessness, irritability, and severe gastrointestinal distress. L.M. realized he was truly addicted to kratom in May 2023 and recognized that he had merely replaced one addiction with another. Though L.M. wanted to stop, he could not.

89.    L.M. turned to kratom because he wanted to responsibly manage his substance dependence without the risk of addiction. Had L.M. known that kratom was so addictive, and that cessation would be so difficult, he would never have purchased the Products.

**Plaintiff D.H.'s Experience**

90.    Plaintiff D.H. first heard about kratom at a smokeshop when it was described to him as being similar to coffee. D.H. was curious and, despite having

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

some reservations, decided to try it out.  When D.H. first purchased MIT45 Products a few years ago in or around 2020, he was not concerned about addiction or any other potential risks because there were no warnings on the packaging or elsewhere in the smoke shop when he looked at the Products.  It was not until D.H. made in first attempt to quit in or around 2022 that he realized he was physically dependent on MIT45. Since then, he has tried, and failed, to fully quit several times, though he has succeeded in reducing his consumption.  At its worst, D.H. was using three to four bottles of Defendant's "Super K" extract shots per week in addition to daily or near-daily use of the MIT45 "Go" gel extract packets.   When D.H. tried to quit in the past, he experienced severe insomnia, headaches, stomach aches, profuse sweating, fatigue, and general malaise. D.H. has purchased, and continues to purchase, MIT45 Products from the Saratoga Hookah Bar smoke shop in Saratoga Springs, New York.  His last purchase of any MIT45 Product was in or around early October 2024.  Had D.H. known that kratom or, more specifically, MIT45 Products were so addictive by way of a warning on the Products packaging, he never would have purchased the Products.

**Plaintiff E.L.'s Experience**

91.    Plaintiff E.L. first learned about kratom approximately two years ago by internet advertisements.  He started consuming kratom powder in or around mid to late-2022.  He first tried MIT45 Products about one year after that and thereafter began regularly consuming Defendant's "Super K Shot" in the purple bottle.  He reviewed the Product's packaging but saw no warning about addictiveness or risk of dependence (or any other negative side effects) on the packaging.  At this time, E.L. was not a daily user every day but in or around early-2024, that changed and E.L. graduated to daily use.  By April 2024, he was purchasing 4 to 5 Super K Shots per week from a smoke shop in Portland, Oregon.  By June 2024, he realized he was physically dependent and attempted to "taper" his use down.  He did this by taking roughly half of the amount of Super K liquid at a time.  In July 2024, he quit cold turkey for about four days before he succumbed to withdrawals and began using again.  When he tried to quit, he

suffered from severe insomnia, cravings, headaches, and a complete lack of energy or motivation.  His last purchase of any MIT45 Product was in September 2024.  Since then, E.L. has continued in his efforts to quit and, much to his credit, has succeeded in limiting most of his recent consumption to raw kratom powder, as opposed to the much stronger extract shots, like Defendant's Products.  Had E.L. known that kratom or, more specifically, MIT45 Products were so addictive by way of a warning on the Products packaging, he never would have purchased the Products.

## CLASS ALLEGATIONS

92.    ***Class Definition***.  Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of themselves and all other similarly situated consumers, defined as follows:

> All persons nationwide who, within the applicable statute of limitations period, up to and including the date of final judgment, purchased MIT45 kratom products (the "Nationwide Class").

> All persons nationwide who, within the applicable statute of limitations period, up to and including the date of final judgment, purchased MIT45 kratom products while in California (the "California Subclass").

> All persons nationwide who, within the applicable statute of limitations period, up to and including the date of final judgment, purchased MIT45 kratom products while in New York (the "New York Subclass").

> All persons nationwide who, within the applicable statute of limitations period, up to and including the date of final judgment, purchased MIT45 kratom products while in Oregon (the "Oregon Subclass").[9]

93.    Specifically excluded from the Classes are Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

---

[9] The California, New York, and Oregon Subclasses, together with the Nationwide Class, are hereafter referred to as the "Classes"

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

94.    Plaintiffs reserve the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

95.    **Numerosity.**    Members of the Classes are so numerous that their individual joinder herein is impracticable.  On information and belief, the Classes comprise at least thousands of consumers  The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

96.    **Commonality and Predominance**.  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

a.    whether the labels on Defendant's Products have the capacity to mislead reasonable consumers;

b.    whether Defendant knew that kratom is a highly addictive substance;

c.    whether Defendant's conduct alleged herein violated the FAL, Cal. Bus. & Prof. Code §§ 17500, *et seq*., the CLRA, Cal. Civ. Code §§ 1750, *et seq.*, the UCL, Cal. Bus. & Prof. Code §§ 17200, *et seq.*; the UTPA, Or. Rev. Stat. § 646.605, *et seq.*; the NYDAPA, N.Y. GBL § 349, *et seq.*; and/or the NYFAA, N.Y. GBL § 350, *et seq.*;

d.    whether Defendant's conduct alleged herein constitutes unjust enrichment;

e.    whether Defendant's conduct constitutes negligent omission;

f.    whether Plaintiffs and the Class are entitled to damages and/or restitution; and

g.    whether Plaintiffs and the Class are entitled to attorneys' fees and costs.

97.    **Typicality.**    The claims of Plaintiffs are typical of the claims of the Classes in that Plaintiffs and the Classes sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to inform Plaintiffs and all others similarly situated that its Products are highly addictive and akin to opioids.

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

98.    ***Adequacy***.  Plaintiffs will fairly and adequately protect Class members' interests.  Plaintiffs have no interests antagonistic to Class members' interests, and Plaintiffs have retained counsel that have considerable experience and success in prosecuting complex class-actions and consumer-protection cases.

99.    ***Superiority***.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Classes; the Classes are readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

100.   Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

101.   Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiffs and members of the Classes and will likely retain the benefits of its wrongdoing.

102.   Based on the foregoing allegations, Plaintiffs' claims for relief include those set forth below.

<u>COUNT I</u>
**Violations of California's Unfair Competition Law ("UCL"),**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**

103.   Plaintiffs B.D. and L.M. re-allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

104.   Plaintiffs B.D. and L.M. bring this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

105.   The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act."  Cal. Bus. & Prof. Code § 17200.  A practice is

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Cal. Bus. & Prof. Code § 17204. Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by the unlawful and/or unfair business practice or act.

106. As alleged below, Defendant has committed unlawful, fraudulent, and/or unfair business practices under the UCL by: (a) representing that Defendant's Products have certain characteristics that they do not, in violation of Cal. Civil Code § 1770(a)(5); (b) advertising goods and services with the intent not to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9); (c) selling addictive substances to unsuspecting consumers and profiting from their addiction; and (d) failing to disclose that its Products pose a serious risk of addiction.

107. Defendant's conduct has the capacity to mislead a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances.

108. Defendant's conduct has injured Plaintiffs B.D. and L.M. and the California Subclass they seek to represent in that they paid money for a product that they would not have purchased or paid more than they would have but for Defendant's failure to disclose the addictive nature of its Products. Such injury is not outweighed by any countervailing benefits to consumers or competition. Indeed, no benefit to consumers or competition results from Defendant's conduct. Since consumers reasonably rely on Defendant's labels, and thus also its omissions, consumers could not have reasonably avoided such injury. *Davis v. Ford Motor Credit Co*., 179 Cal. App. 4th 581, 597-98 (2009); *see also Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010) (outlining the third test based on the definition of "unfair" in Section 5 of the FTC Act).

109.   Pursuant to California Business and Professional Code § 17203, Plaintiffs B.D. and L.M. and the California Subclass members seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiffs B.D. and L.M. and the other California Subclass members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiffs B.D. and L.M. and the California Subclass members' attorneys' fees and costs.

110.   Here, equitable relief is appropriate because Plaintiffs B.D. and L.M. may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiffs B.D. and L.M. would be left without the parity in purchasing power to which they are entitled.

## COUNT II
### Violation of California's Consumers Legal Remedies Act,
### Cal. Civ. Code §§ 1750, *et seq.*

111.   Plaintiffs B.D. and L.M. reallege and reincorporate by reference all paragraphs alleged above.

112.   Plaintiffs B.D. and L.M. bring this claim individually and on behalf of the California Subclass against Defendant.

113.   Plaintiffs B.D. and L.M. and California Subclass members are consumers within the meaning of Cal. Civ. Code § 1761(d).

114.   Cal. Civ. Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which she or she does not have."

115.   Cal. Civ. Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

116.   Cal. Civ. Code § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

117.   Defendant violated Cal. Civ. Code §§ 1770(a)(5), (a)(7), and (a)(9) by intentionally and misleadingly representing that its Products are "all natural" and by failing to disclose that its Products are addictive, a fact which is material to reasonable consumers such as Plaintiffs B.D. and L.M. and the California Subclass members.

118.   Defendant's misrepresentations and omissions deceive and have a tendency and ability to deceive the general public.

119.   Defendant has exclusive or superior knowledge of kratom's addictive nature, which was not known to Plaintiffs B.D. and L.M. or the California Subclass members.

120.   Plaintiffs B.D. and L.M. and California Subclass members have suffered harm as a result of these violations of the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* (CLRA) because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid had they known that kratom is addictive and causes withdrawals.

121.   Plaintiffs B.D. and L.M., on behalf of themselves and all other members of the California Subclass, seek an injunction prohibiting Defendant from continuing their unlawful practices in violation of the CLRA.

122.   In compliance with the provisions of California Civil Code § 1782, Plaintiffs sent written notice to Defendant on January 29, 2024, informing Defendant of their intention to seek damages under California Civil Code § 1750.  The letter was sent via certified mail, return receipt requested, advising Defendant that they were in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter expressly stated that it was sent on behalf of Plaintiffs and "all other persons similarly situated."  Accordingly, if Defendant fails to take corrective action within 30 days of receipt of the demand letter, Plaintiffs will amend their complaint to include a request

for damages as permitted by Civil Code § 1782(d) for Defendant's violations of the CLRA.

## COUNT III
### Violation of California's False Advertising Law,
### Cal. Bus. & Prof. Code §§ 17500, *et seq.*

123.   Plaintiffs B.D. and L.M. reallege and reincorporate by reference all paragraphs alleged above.

124.   Plaintiffs B.D. and L.M. bring this claim individually and on behalf of the California Subclass against Defendant.

125.   Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive California Subclass members and the public.  As described above, and throughout this Complaint, Defendant misrepresented that kratom is not addictive.  Such representation is not true.

126.   By its actions, Defendant disseminated uniform advertising regarding its kratom Products to and across California.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* (the FAL).   Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

127.   The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant continues to misrepresent, without qualification, that kratom is not addictive.

128.   In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law.  Defendant knows that kratom is addictive yet fails to disclose this fact to consumers.

129.   Plaintiffs B.D. and L.M. and other California Subclass members purchased MIT45 Kratom based on Defendant's representations and omissions that

kratom is not addictive.  Once their addictions developed, Plaintiffs B.D. and L.M. felt they could not stop purchasing Defendant's Products despite their efforts to quit.

130.    The misrepresentations and non-disclosures by Defendant of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitutes a violation of the FAL.

131.    As a result of Defendant's wrongful conduct, Plaintiffs B.D. and L.M. and California Subclass members lost money in an amount to be proven at trial. Plaintiffs B.D. and L.M. and California Subclass members are therefore entitled to restitution as appropriate for this cause of action.

132.    Plaintiffs B.D. and L.M. and the California Subclass members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs; and other appropriate equitable relief.

## COUNT IV
### Violation of Oregon's Unlawful Trade Practices Act ("UTPA")
### OR. REV. STAT. § 646.605 *et seq.*

133.    Plaintiff E.L. realleges and incorporates by reference every allegation set forth in the preceding paragraphs.

134.    Plaintiff E.L. brings this claim individually and on behalf of the members of the proposed Oregon Subclass against Defendant for violations of the UTPA, Or. Rev. Stat. § 646.605, *et seq.*

135.    The UTPA is intended to be interpreted liberally to protect consumers, covering a broad spectrum of unfair or deceptive practices in trade or commerce.

136.    The unlawful methods, acts and practices pled herein were committed in the course Defendants' business.  Or. Rev. Stat. § 646.608(1).

137.    Defendant is a "person," as defined by Or. Rev. Stat. § 646.605(4). Defendant is engaged in "trade" and "commerce" in Oregon by advertising, offering

or distributing for sale goods that directly or indirectly affect the people of the State of Oregon, as defined by Or. Rev. Stat. § 646.605(8).

138.    Defendant's kratom Products are "goods" that Plaintiffs and the proposed Oregon Class obtained primarily for personal purposes, as defined by Or. Rev. Stat. § 646.605(6).

139.    Or. Rev. Stat. § 646.608(1)(e) states that it is an unlawful business practice for a company to represent that their goods sold have characteristics, ingredients, uses, or benefits that they do not have.  This provision is specifically intended to prevent economic harm based on deceptive commercial practices and extends to omissions.

140.    A "representation" under Or. Rev. Stat. § 646.608(1) is any manifestation of any assertion by words or conduct, including, but not limited to, a failure to disclose a fact.

141.    The Supreme Court of Oregon has clarified that for a Defendant to violate the UTPA provisions prohibiting misrepresentations about a product's attributes, it is not required that the misrepresentations be material to consumer purchasing decisions. *See State ex rel Rosenblum v. Living Essentials, LLC*, 371 Or. 23 (2023).  This means that any misrepresentation about the product, regardless of its influence on the purchasing decision, can be actionable under the UTPA.

142.    Defendant has further engaged in "unconscionable tactics" by knowingly taking advantage of consumers' physical infirmity and ignorance, and knowingly permitting customers to enter into transactions in which the customers will derive no material benefit.  Or. Rev. Stat. § 646.605(9).

143.    Defendant's unlawful omissions, acts, and practices pled herein were "willful violations" of Or. Rev. Stat. § 646.608 because Defendant knew or should have known that Defendant's conduct was a violation, as defined by Or. Rev. Stat. § 646.605(10).

144.   Defendant's methods, acts and practices, including Defendant's representations, omissions, active concealments and failures to disclose, violated and continue to violate the UTPA.

145.   With respect to omissions, Defendant at all relevant times had a duty to disclose the information in question because (i) Defendant had exclusive knowledge of material information that was not known to Plaintiffs and the Oregon Subclass (i.e., that kratom is highly addictive); (ii) Defendant concealed material information from Plaintiffs and the Oregon Class; and/or (iii) Defendant made partial representations which were false and misleading absent the omitted information.

146.   Defendant's misrepresentations and nondisclosures deceive and tend to deceive a reasonable consumer and the general public.

147.   Defendant engaged in these reckless or knowing use of these unlawful methods, acts or practices alleged herein which have been declared unlawful by the UTPA.

148.   As a direct, substantial and/or proximate result of Defendant's conduct, Plaintiff E.L. and the Oregon Subclass members suffered compensable and ascertainable losses.

149.   Plaintiff E.L. and the Oregon Subclass members would not have purchased the Products at the prices they paid if they had known the harmful opioid-like effects of kratom consumption and/or its addiction and withdrawal symptoms.

150.   Plaintiff E.L. seeks on behalf of himself and the Oregon Subclass: (1) the greater of statutory damages of $200 or actual damages for every violation of the act; (2) punitive damages; (3) appropriate equitable relief, including injunctive and restitution, as appropriate; and (4) attorneys' fees and costs pursuant to Or. Rev. Stat. § 646.638, *et seq.*

151.   Under the UTPA, a private plaintiff may seek an injunction as may be necessary to ensure cessation of unlawful business and trade practices. Or. Rev. Stat. § 646.636. The unlawful acts and omissions pled herein were, are, and continue to be

FIRST AMENDED CLASS ACTION COMPLAINT                     CASE NO. 24-CV-0499-L-DEB

part of a pattern or generalized course of conduct. Defendant's conduct is ongoing and is likely to continue and recur absent a permanent injunction. Accordingly, Plaintiff E.L. seeks an order enjoining Defendant from committing such unlawful practices pursuant to Or. Rev. Stat. § 646.638(8)(c); Or. Rev. Stat. § 646.636. The balance of the equities favors the entry of permanent injunctive relief against Defendant. Plaintiff E.L., the Oregon Subclass members, and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiff E.L., the Oregon Subclass members and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Plaintiff E.L. is informed and believes and thereon alleges that Defendant's unlawful behavior is ongoing as of the date of the filing of this Complaint. If not enjoined by order of this Court, Defendant will or may continue to injure Plaintiff E.L. and Oregon consumers through the misconduct alleged herein. Absent the entry of a permanent injunction, Defendant's unlawful behavior will not cease and, in the unlikely event that it voluntarily ceases, it is capable of repetition and is likely to reoccur.

152.   This action was brought "within one year after the discovery of the unlawful method, act or practice." Or. Rev. Stat. § 646.638(6). By Defendant's design, its misrepresentations and omissions regarding the effects of the ingredients in its kratom Products made it virtually impossible for the typical consumer to discover the truth. Plaintiff E.L. and members of the proposed Oregon Subclass were reasonable consumers who trusted Defendant's representations when they purchased Defendant's kratom Products.

### COUNT V
**Violation of New York's Consumer Protection from Deceptive Acts and Practices Act ("NYDAPA")**
**N.Y. GBL §§ 349,** *et seq.*

153.   Plaintiff D.H. re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs.

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

154.    Plaintiff D.H. brings this cause of action individually and on behalf of the members of the proposed New York Subclass against Defendant for violations of the NYDAPA, N.Y. GBL § 349, *et seq.*

155.   NYDAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. GBL § 349.  Defendant's conduct, as set forth herein, constitutes deceptive acts or practices under this section.

156.   Plaintiff D.H. and members of the proposed New York Subclass are "persons" under the NYDAPA, N.Y GBL § 349(h), and Defendant's actions as set forth herein occurred in the conduct of "business, trade or commerce" under the NYDAPA.

157.   In the course of its business, Defendant marketed its kratom Products in such a way that gave consumers, including Plaintiff D.H. and members of the proposed New York Subclass, the impression that its Products were safe to consume and did not cause any opioid-like addiction and withdrawal symptoms; therefore, leading to the false impression that Defendant's Products were worth more than they actually were.

158.   Plaintiff D.H. and members of the proposed New York Subclass had no way of discerning that Defendant's representations were false and misleading.

159.   Defendant thus violated and continues to violate NYDAPA by making statements that, when considered from the perspective of a reasonable consumer, give the false impression that Defendant's kratom Products are safe to consume and do not cause opioid-like effects and withdrawal symptoms.

160.   Defendant knew or should have known that its conduct violated NYDAPA and Defendant owed a duty to Plaintiff D.H. and members of the proposed New York Subclass to refrain from engaging in deceptive acts or practices, and to disclose the truth about kratom's harms.

161.   Defendant made affirmative misrepresentations and omissions when it failed to disclose material facts regarding the harms of its kratom Products with the intent to mislead Plaintiff D.H. and members of the proposed New York Subclass.

162. Defendant's misleading and false advertising regarding the addictive nature of kratom was material to Plaintiff D.H. and members of the proposed New York Subclass, as they relate to the safety of the Product the consumer received and paid for. A reasonable consumer would attach importance to such representations and would be induced to act thereon in deciding whether or not to purchase the product.

163. Defendant's unfair and/or deceptive acts or practices were likely to and did deceive reasonable consumers, including Plaintiff D.H. and members of the proposed New York Subclass. Plaintiff D.H. and members of the proposed New York Subclass reasonably relied upon Defendant's misrepresentations and omissions when purchasing Defendant's kratom Products. Plaintiff D.H. and members of the proposed New York Subclass would not have purchased Defendant's Products but for Defendant's failure to disclose kratom's composition, addictive nature, and the negative side effects and withdrawal symptoms that would result from use of Defendant's Products.

164. Defendant's violations of NYDAPA, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Plaintiff D.H., members of the proposed New York Subclass, and the public will be deceived into purchasing Products based on Defendants misrepresentations and omissions regarding the purported "benefits" and actual harms posed by its kratom Products. These misrepresentations lead to financial damage for consumers like Plaintiff D.H. and members of the proposed New York Subclass who would not have bought Defendant's Products had they known kratom's true nature.

165. As a direct and proximate result of Defendant's misleading and false advertisements, as well as Defendant's deceptive and unfair acts and practices made during the course of Defendant's business, Plaintiff D.H. and members of the proposed New York Subclass suffered ascertainable loss and actual damages.

166. Plaintiff D.H. and members of the proposed New York Subclass are entitled to all of the damages, remedies, fees, and costs available under NYDAPA,

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

including but not limited to, injunctive relief, recovery of actual damages and/or fifty dollars in statutory damages, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## COUNT VI
### Violation of New York False Advertising Act ("NYFAA")
### N.Y. GBL §§ 350, *et seq.*

167.   Plaintiff D.H. realleges and reincorporates by reference all paragraphs alleged above.

168.   Plaintiff D.H. brings this claim individually and on behalf of the proposed New York Subclass against Defendant for violations of the NYFAA, N.Y. GBL § 350.

169.   The NYFAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. GBL § 350. False advertising includes "advertising, including labeling of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of such representations [made] with respect to the commodity . . ." N.Y. GBL § 350(a).

170.   Defendant's misrepresentations and omissions in its Products' packaging, marketing, and website descriptions regarding the true nature, composition, and harms of its kratom Products constitute an unfair, untrue, and misleading practice.  This deceptive marketing practice gave consumers the false impression that Defendant's Products were natural and/or safe to consume, and therefore lead to the false impression that the Products sold by Defendant were worth more than they actually were.

171.   Defendant misled consumers by making untrue and misleading statements and failing to disclose material facts regarding the true nature and effects of its kratom Products with the intent to mislead Plaintiff D.H. and members of the proposed New York Subclass.

172.   Defendant's unfair and deceptive acts or practices were likely to, and did, deceive reasonable consumers, including Plaintiff D.H. and members of the proposed

New York Subclass, about the real harmful nature of its kratom Products.  Plaintiff D.H. and members of the proposed New York Subclass reasonably relied upon Defendant's misrepresentations when purchasing Defendant's Products.  Plaintiff D.H. and members of the proposed New York Subclass would not have purchased Defendant's Products but for Defendant's misrepresentations and omissions regarding the true nature of kratom and the effects of the ingredients in its kratom Products.

173.   Defendant's violations of the NYFAA, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Plaintiff D.H., members of the proposed New York Subclass, and the public will be deceived into purchasing Products based on Defendants misrepresentations and omissions regarding the harmful and addictive nature of its Products.  These misrepresentations and omissions by Defendant lead to financial damage for consumers like Plaintiff D.H. and members of the proposed New York Subclass.

174.   As a direct and proximate result of Defendant's misleading and false advertisements, as well as Defendant's deceptive and unfair acts and practices made by Defendant's business, Plaintiff D.H. and members of the proposed New York Subclass suffered ascertainable loss and actual damages.

175.   Plaintiff D.H. and members of the proposed New York Subclass are entitled to all the damages, remedies, fees, and costs available under the NYFAA, including but not limited to, injunctive relief, recovery of actual damages and/or $500 per violation, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## COUNT VII
### Breach of Implied Warranty

176.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

177.   Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

178.  Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Products, impliedly warranted that that kratom is not addictive and does not cause opioid-like withdrawal symptoms.

179.  Defendant breached this warranty implied in the contract for the sale of its kratom Products because the Products could not pass without objection in the trade under the contract description: the kratom Products were not adequately contained, packaged, and labeled as per Defendant's contract with Plaintiffs and members of the Classes, and the Products do not conform to the implied affirmations of fact made on the marketing and packaging for the Products that the Products are not addictive and do not cause withdrawals.  U.C.C. §§ 2-313(2)(a), (e), (f).  As a result, Plaintiffs and members of the Classes did not receive the goods as impliedly warranted by Defendant to be merchantable.

180.  Plaintiffs and members of the Classes purchased the Products in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

181.  The kratom Products were defective when they left the exclusive control of Defendant.

182.  Plaintiffs and members of the Classes did not receive the goods as warranted.

183.  As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and members of the Classes have been injured and harmed because: (a) they would not have purchased MIT45 Kratom on the same terms if they knew that the Product was addictive and could cause opioid-like withdrawal symptoms; and (b) the Products do not have the characteristics, uses, or benefits as promised by Defendant.

184.  Prior to filing this action, Defendant was served with a pre-suit notice letter on behalf of Plaintiffs that complied in all respects with U.C.C. §§ 2-314 and 2-607.  Plaintiffs' counsel sent Defendant a letter advising Defendant that it breached

1    an implied warranty and demanded that Defendant cease and desist from such breaches

2    and make full restitution by refunding the monies received therefrom.  Accordingly, if

3    Defendant fails to take corrective action within 30 days of receipt of the demand letter,

4    Plaintiffs will amend their complaint to include a request for damages as permitted by

5    U.C.C. § 2-607.

6    ### COUNT VIII
### Unjust Enrichment

7    185.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged

8    above.

9    186.   Plaintiffs bring this claim individually and on behalf of the Classes

10   against Defendant.

11   187.   Plaintiffs and the members of the Classes conferred a benefit on

12   Defendant in the form of the gross revenues Defendant derived from the money they

13   paid to Defendant.

14   188.   Defendant had an appreciation or knowledge of the benefit conferred on

15   it by Plaintiffs and the members of the Classes.

16   189.   Defendant has been unjustly enriched in retaining the revenues derived

17   from Plaintiffs and the Class members' purchases of the Products, which retention of

18   such revenues under these circumstances is unjust and inequitable because Defendant

19   omitted that the Products were addictive and similar to opioids.  This caused injuries

20   to Plaintiffs and members of the Classes because they would not have purchased the

21   Products or would have paid less for them if the true facts concerning the Products had

22   been known.

23   190.   Defendant accepted and retained the benefit in the amount of the gross

24   revenues it derived from sales of the Products to Plaintiffs and the members of the

25   Classes.

26   191.   Defendant has thereby profited by retaining the benefit under

27   circumstances which would make it unjust for Defendant to retain the benefit.

28

FIRST AMENDED CLASS ACTION COMPLAINT               CASE NO. 24-CV-0499-L-DEB

192.   Plaintiffs and the members of the Classes are, therefore, entitled to restitution in the form of the revenues derived from Defendant's sale of the Products.

193.   As a direct and proximate result of Defendant's actions, Plaintiffs and the members of the Classes have suffered in an amount to be proven at trial.

194.   Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Product is determined to be an amount less than the premium price of the Product. Without compensation for the full premium price of the Product, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

195.   Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price will ensure that Plaintiffs is in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at their disposal.

## COUNT IX
### Fraud by Omission

196.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

197.   Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

198.   Defendant distributed its Products throughout the State of California.

199.   Defendant misrepresented that its kratom Products have attributes or qualities that they do not have by failing to disclose that kratom is addictive and can cause opioid-like withdrawal.

200.   Defendant knows that kratom is addictive because it interacts with kratom vendors, has been made aware of user reports, and has fully characterized kratom's alkaloids and created advanced extraction methods.

201. Defendant knows that knowledge of kratom's addictive nature is a material fact that would influence the purchasing decision of reasonable consumers.

202. The average reasonable consumer in the kratom purchasing context does not know that kratom is addictive and cannot reasonably access that information.

203. Defendant therefore had a duty to Plaintiffs and the members of the Classes to disclose that kratom is addictive and can cause withdrawals on the Products' packaging.

204. Consumers reasonably and justifiably relied on Defendant's omission because it is reasonable to assume that a product which is addictive like an opioid would bear some kind of a warning.

205. As a result of Defendant's omission, Plaintiffs and the members of the Classes paid for kratom Products they may not have purchased or paid more for those Products than they would have had they known the truth about kratom.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs B.D., L.M., D.H., and E.L., individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

A. for an order certifying the Classes and naming Plaintiffs as representatives of the Classes and Plaintiffs' attorneys as Class Counsel to represent the Classes;

B. for an order that the discovery rule, pursuant to, without limitation, Or. Rev. Stat. § 646.638(6), applies and that the applicable limitations period—and the corresponding Class Period for the Oregon Class—extends back to the very first date that Defendant began engaging in the unlawful conduct alleged herein;

C. for an order declaring Defendant's conduct violates the statutes referenced herein;

D. for an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

E. for actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury pursuant to the claims brought herein;

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB

F.  for prejudgment interest on all amounts awarded;

G.  for an order of restitution and all other forms of equitable monetary relief;

H.  for injunctive relief as pleaded or as the Court may deem proper;

I.  for an order awarding Plaintiffs and the Classes their reasonable attorneys' fees, expenses, and costs of suit; and

J.  for such other and further relief as the Court may deem necessary or appropriate.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  December 10, 2024            **BURSOR & FISHER, P.A**.

By:   /s/ *Neal J. Deckant*
                Neal J. Deckant

Neal J. Deckant (State Bar No. 322946)
Luke Sironski-White (State Bar No. 348441)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com
            lsironski@bursor.com

**LYNCH CARPENTER LLP**
Todd D. Carpenter (CA 234464)
todd@lcllp.com
Scott G. Braden (CA 305051)
scott@lcllp.com
1234 Camino Del Mar
Del Mar, California 92014
Telephone:  619.762.1910
Facsimile:   858.313.1850

*Attorneys for Plaintiffs and*
*Proposed Class Counsel*

FIRST AMENDED CLASS ACTION COMPLAINT            CASE NO. 24-CV-0499-L-DEB

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, Neal J. Deckant, declare as follows:

1.      I am counsel for Plaintiffs, and I am a partner at Bursor & Fisher, P.A.  I make this declaration to the best of my knowledge, information, and belief of the facts stated herein.

2.      The complaint filed in this action is filed in the proper place for trial because many of the acts and transactions giving rise to this action occurred in this District, and because Plaintiff B.D. resides in this District.

3.      Plaintiff B.D. alleges he is a resident of San Diego, California.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, executed on December 10, 2024, at Miami, Florida.

*/s/ Neal J. Deckant*

Neal J. Deckant

FIRST AMENDED CLASS ACTION COMPLAINT                    CASE NO. 24-CV-0499-L-DEB