**BURSOR & FISHER, P.A.**
Neal J. Deckant (SBN 322946)
Luke Sironski-White (SBN 348441)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com
          lsironski@bursor.com

**LYNCH CARPENTER, LLP**
Todd D. Carpenter (SBN 234464)
todd@lcllp.com
Scott G. Braden (SBN 305051)
scott@lcllp.com
Alexandra R. Stasio (SBN 358410)
alexandras@lcllp.com
9171 Towne Centre Drive, Ste. 180
San Diego, CA 92122
Tel:   (619) 762-1910
Fax:   (858) 313-1850
*Attorneys for Plaintiffs and*
*Proposed Class Counsel*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA MOORHEAD, L.M., D.H., and E.L., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>MIT45, INC.,<br><br>Defendant. | Case No. 3:24-cv-00499-L-DEB<br><br>**DECLARATION OF NEAL J. DECKANT IN SUPPORT OF PLAINTIFFS' REPLY ISO MOTION FOR CLASS CERTIFICATION** |

DECLARATION OF NJD ISO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 3:24-CV-00499-L-DEB

I, Neal J. Deckant, hereby declare:

1. I am a partner of the law firm Bursor & Fisher, P.A., an attorney licensed in the State of California, duly admitted to practice before this Court in this matter, and counsel of record for Plaintiffs. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently thereto. I make this declaration in support of Plaintiffs' Reply In Support of Their Motion for Class Certification.

2. Attached hereto as **Exhibit 1** is a true and correct copy of portions of the transcript of the deposition of Ryan Niddel, taken on January 16, 2026.

3. Attached hereto as **Exhibit 2** is a true and correct copy of portions of the transcript of the deposition of Christopher McCurdy, taken on April 29, 2026.

4. Attached hereto as **Exhibit 3** is a true and correct copy of portions of the transcript of the deposition of Matthew Connors, taken on April 27, 2026.

5. Attached hereto as **Exhibit 4** is a true and correct copy of the Reply Declaration of Daniel Overbeek.

6. Attached hereto as **Exhibit 5** is a true and correct copy of the Reply Declaration of Andrea Lynn Matthews.

7. Attached hereto as **Exhibit 6** is a true and correct copy of portions of the transcript of the deposition of Mark Keegan, taken on May 1, 2026.

8. Attached hereto as **Exhibit 7** is a true and correct copy of the Reply Declaration of William Ingersoll.

I declare under penalty of perjury under the laws of the State of California that the above and foregoing is true and accurate. Executed this 7th day of May 2026, at Walnut Creek, CA.

1

Dated:        May 7, 2026              Respectfully submitted,

_____
Neal J. Deckant

DECLARATION OF NJD ISO PLAINTIFFS' REPLY BRIEF
CASE NO. 3:24-CV-00499-L-DEB

**EXHIBIT 1**

Transcript of the Testimony of:

# RYAN NIDDEL - 30(B)(6)

MOORHEAD, et al.

vs.

MIT45 INC.

**Confidential**

January 16, 2026

Volume I

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Maria Moorhead, L.M., D.H.,
and E.L, individually and on
behalf of all those
similarly situated,               Case No.

     Plaintiffs,              3:24-cv-00499-L-DEB

   vs.

MIT45 INC.,

     Defendant.

——————————————————————————

C O N F I D E N T I A L

VIDEOTAPED VIDEOCONFERENCED RULE 30(b)(6)

DEPOSITION OF RYAN NIDDEL

FRIDAY, JANUARY 16, 2026

9:17 A.M.


APPEARING REMOTELY VIA ZOOM FROM

SALT LAKE CITY, UTAH


REPORTED BY:

Stephani L. Loder

CSR No. 13884

And so to start with, they're not validating what's in product -- what's in bottle.

At the end, I don't know if they're sending it out for third party or not.  We submit to them our certificates of analysis all the way through the process as part of the approval at the end.

Q. Got it.  That was helpful.

Who decided that "GMP certified" should appear on MIT45's packaging?

A. I don't know specifically.  I don't know who decided that.

Q. It predated you?  Is that accurate to say?

A. I don't know that it would have been on packaging prior to me or not.  So I don't know that it would be fair to say that because it's -- when I look at it is until I signed off on labels and I knew for certain that our facility was GMP compliant, that's when I know for certain that we have it on label at that point.  I couldn't speak to before that.

Q. Okay.  At any point during the class period, did any MIT45 product label include a warning that specifically referenced addiction, dependence, or withdrawal?

A. No.  I do not believe that they did.  Well --

Q. Did any -- go ahead.

the Boost product?

A. 2023.  Probably late in 2023.

Q. Would this label have been used across the nation for the Boost product from about 2020 to about 2023?

A. Say same as before, based off of, you know, if there were various revisions required from local or state or federal requirements or overlays with stickers.

Moving those things aside, I would feel comfortable saying this was the label.

But as you see underneath the UPC code, how it says V1.3A, this is at least the third revision just to get to this point, which is kind of what those numbers would be indicative of on the bottom.

Q. So would MIT45, when it was rolling out revisions to the label itself, not the stickers, would that revision then replace the prior version everywhere in the nation?

A. Removing the caveat of stickers, the answer would be yes.

Q. Okay.

A. Replace -- "replace," to me, would mean we're not going out to market and clawing back products. We're simply updating packaging, and when next orders would come in, new packaging would get -- or new orders

**EXHIBIT 2**

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

_____

MARIA MOORHEAD, L.M., D.H.,     )

and E.L., on behalf of          )

themselves and all others       )

similarly situated,             )

         Plaintiffs,     ) No:

  vs.                           ) 3:24-CV-00499-L-DEB

MIT45, INC.,                    )

        Defendant.      )

_____


REMOTE VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION

OF

CHRISTOPHER R. McCURDY, PhD, BSPh, FAAPS

_____


WITNESS TIME: 1:27 P.M. Eastern Daylight Time

April 29, 2026

WITNESS LOCATION: Gainesville, Florida


Reported by: CONNIE FARANDA, RPR, CCR 2240, CSR 20-0462

Page 1

A  P  P  E  A  R  A  N  C  E  S

(All participants attending remotely.)


FOR THE PLAINTIFFS:

NEAL J. DECKANT

Bursor & Fisher, PA

1990 North California Boulevard, Ninth Floor

Walnut Creek, California 94596

925.300.4455

ndeckant@bursor.com




FOR THE DEFENDANT:

NATHAN D. THOMAS

Parsons Behle & Latimer

201 South Main Street, Suite 1800

Salt Lake City, Utah 84111

801.532.1234

nthomas@parsonsbehle.com




ALSO PRESENT:

ROBERT FENTON, Videographer


Page 2

                            I N D E X


 EXAMINATION BY:                                        PAGE

        Mr. Deckant                                       6

        Mr. Thomas                                      110

 EXHIBITS FOR IDENTIFICATION                            PAGE

  Exhibit 1   Confidential Expert Report        16
              of Christopher R. McCurdy

  Exhibit 2   10/28/25 expert engagement        36
              letter

  Exhibit 3   4/7/26 invoice                    41

  Exhibit 4   Date and time log                 43

  Exhibit 5   Expert report of Daniel           57
              Overbeek, M.D.

  Exhibit 6   Email chain                       67

  Exhibit 7   Email chain                       76

  Exhibit 8   Email                             81

  Exhibit 9   Email chain                       82

  Exhibit 10  Plaintiffs' Motion for            83
              Class Certification

                                              Page  3

someone might use it from the traditional sense, but they have not been as popular.  One is being touted as helping with control of blood glucose, and another as nature's Viagra.

Q.  Okay then.

You did mention, though, that one of the traditional uses is to mitigate I think you said opium withdrawal in traditional use overseas.  Right?

A.  Correct.

Q.  Okay.  And from a pharmacological perspective, why might kratom mitigate opium withdrawal?

A.  So this was the heart of our question to study this plant.  And what we've uncovered and learned is, there -- there are many reasons pharmacologically that this can happen.

First and foremost, the main ingredient, if you will, the major alkaloid, mitragynine, acts as a partial mu-opioid receptor agonist.  That means it basically is like a car with a governor on it.  It can't go over a certain speed.  It can only activate the opioid receptor to a certain level.

That is equivalent and very similar to a drug that is utilized to treat, that is FDA approved, called buprenorphine.  It is very similar in its pharmacological profile.  Yet it has one distinction

Page 92

from buprenorphine, in that mitragynine, the major alkaloid in kratom, also activates adrenergic receptors, which we talked about a little bit earlier.

And with that adrenergic activation, it actually also activates a system that is targeted with another FDA-approved drug for opioid withdrawal called lofexidine, which is an alpha-2 adrenergic agonist.

Clonidine is another drug that is an alpha-2 agonist. It's an older drug. It's utilized a lot in the treatment of opioid withdrawal. But it is not indicated by FDA for that purpose. But it is less expensive, and that's why physicians utilize it. It's been around longer.

But in the -- in the -- those two drugs, buprenorphine and whether it be clonidine or lofexidine, those two drugs are given together as FDA-approved treatment for opioid withdrawal and treating opioid use disorders.

We became excited about that as we started to uncover the pharmacology associated with mitragynine, because it basically had the properties of two FDA-approved pharmaceuticals in one molecule that could certainly help in the avoidance of opioid withdrawal and potentially as a medication-assisted therapy for treatment.

Page 93

In humans, what has been recorded in, again, the limited clinical trial conditions that have been utilized are withdrawals that are noted such as headache, irritability, and some GI discomforts.

Q.  And your prior answer does not take into account case reports; correct?

A.  Correct.

Q.  And your prior answer does not take into account the experiences of physicians treating individuals who consume kratom; correct?

A.  Correct.

Q.  Is kratom potentially habit-forming?

A.  Potentially I would say there's a potential. Do we know that it is habit-forming?  The only thing that has been reported in the -- in the literature, again, the scientific literature, is that it has a habit-forming potential similar to coffee.

Q.  I see.

And we've already touched upon this, but for the clarity of the record, when you say "scientific literature," you're referring to peer-reviewed studies; correct?

A.  Correct.  Controlled peer-reviewed studies.

Q.  Thank you.

And you are not taking into account case

Page 100

**EXHIBIT 3**

UNITED STATES DISTRICT COURT

FOR THE

SOUTHERN DISTRICT OF CALIFORINA


MARIA MOORHEAD, L.M., D.H. and

E.L., on behalf of themselves

and all others similarly situated,

          Plaintiffs,

vs.                              No. 3:24-cv-00499-L-DEB

MIT45, INC.,

          Defendants.

_____/


               DEPOSITION OF MATTHEW CONNORS, CPA

               (Contains some CONFIDENTIAL portions)

               APRIL 27, 2026 at 1:13 p.m. (MDT)

               Before:  ERIC L. JOHNSON

                        RPR, CSR #9771

               Taken at:

               via Zoom Videoconference

Page 1

Matthew A. Connors - April 27, 2026

A. I think I just answered that. I would consult with counsel on what the approach should be, whether it should be, you know, that we are going for a full refund, and here are our individuals, and what evidence do you need to show how much they have spent?

Then I would get that -- I would be getting documents from those individuals to -- you know, bank records, and show me the documents that -- so I can prove how much you spent.

If -- you know, there are other methods for calculating damages to individuals. If it was -- that's why I say I would have to consult with counsel if -- you know, if Joe got addicted to like a drug and he -- his life got derailed and he was, you know, on the path to medical school and now he's like under the viaduct, and what are his lost earnings, that's a totally different analysis.

Q. Okay. So --

A. That's why I would say I would have to consult with counsel and say, like, what's our -- what's the general -- you know, what's the theory of damages.

Q. All right. So you would defer to counsel on the theory of damages and what the approach to the measure of damages should be.

Is that what you said?

ATTORNEY CHRISTIANSEN: Objection to form.

THE WITNESS: I would consult with counsel on their theory of damages and then I would seek to get the documents and information that I need to do that analysis.

ATTORNEY BRADEN: Q. So if it was full refund versus a price premium, you would expect that decision to come from counsel and then you would go from there; is that right?

A. It would certainly weigh into the analysis. And you know, as an expert, I would be saying, you know, if it is a full refund, then from there I would be saying like here's the type of information that I need. I need a good set of, like, records for one, if I am -- it just -- you know, there's so many possibilities for calculating damages. If we're just talking on an individual by individual basis then, yeah, I would be trying to get actual data to show proof of what has been spent.

Q. Okay. So conceivably you could do a full refund measure of damages if you got the right data from counsel.

Is that what you said?

A. If I -- if I got the data that I thought would prove, then I think I could do it.

Q. So the methodology is doable. It is not impossible to do it, correct?

A. I don't think it is impossible to do, no. I mean, fundamentally you are talking about a pretty straight-forward thing, like what did consumers spend on a product.

Q. Okay. All right. So I asked you whether you -- what methodology you would use to calculate individual damages for a class member.

Did you develop any methodology for any individual calculation?

A. No.

Q. Did you perform any individual damages calculation for any plaintiff or class member?

A. I have not.

Q. You say damages should be, quote, reasonably offset for benefits obtained, in paragraph 57. How would you quantify those benefits?

A. Yeah, that's another point that I am anxious to see how your expert develops that, if he does at all. Because I think it has got to be factored in.

Q. How would you do it?

A. I think there are probably many ways to do it but I guess I am waiting to see what he plans to do. I haven't been tasked with that analysis, so I really

haven't put any thought into it.

Q. Well, could you give me any sort of example or elaboration on how you would go about quantifying these benefits, if someone asked you to?

A. I don't have anything for you today.

Q. So as you sit here today, you can't tell me how to reasonably quantify the benefit -- the reasonable offset for those benefits, correct?

ATTORNEY CHRISTIANSEN: Objection to form.

THE WITNESS: As I sit here today, there are very obvious, simple things that could be done; like if somebody is -- needs energy and they, you know, they want to go to Starbucks three times a day. Like I mean, you know, you can do different analyses and estimates. But I guess I am waiting to see what your expert comes up with.

ATTORNEY BRADEN: Q. Can you think of any way at all to reasonably quantify those benefits?

A. Yeah, I mean, people that purchase the product but didn't get addicted to it or don't think they have an addiction to it, you know, and are satisfied with the product, that feels like they don't have any damage. So that's one benchmark.

Q. So 100 percent would be the quantity of the offset in that example, correct?

25 (Pages 94 - 97)

ATTORNEY BRADEN: Q. I'm sorry. What was your answer?

A. I said I don't know.

Q. Do you dispute whether a class-wide calculation is structurally feasible?

ATTORNEY CHRISTIANSEN: Objection to form.

THE WITNESS: I mean, generally feasible? It probably is feasible, but I don't think it is feasible on the data that he intends to rely.

ATTORNEY BRADEN: Q. Okay. So paragraphs 42 through 47 you discuss Dr. Matthews' survey.

Did anyone ask you to opine on Dr. Matthews' work?

A. No, I -- I got Dr. Matthews' report. And just, you know, from my review of it, I was surprised at the language there, and that she said what she said multiple times. It felt like -- just felt like it wasn't being very objective.

Q. And what specific language surprised you?

A. I think where she said over and over, you know, correctly believing that the MIT45 product was habit forming. I think she said that over and over. My take was if that's a disputed fact, then I think it is a problem that somebody comes in with a preconceived notion.

Page 114

Q. So when she said that, what did you take it to mean?

A. I took it to mean that she has already -- she already believes that the kratom product is habit forming.

Q. As a matter of like existential reality, you know, as matter of truth? Is that what you are saying?

A. Yeah.

Q. Okay. Had you ever designed a -- well, strike that.

You are not a survey methodology expert, are you?

A. I am not.

Q. Have you ever designed a consumer perception survey?

A. No, I have not.

Q. Have you ever published on survey methodology?

A. I have not.

Q. Ever been qualified as an expert on consumer survey design or analysis?

A. I have never opined on that.

Q. So paragraph 44, let's turn to that.

You say that Dr. Matthews' work is, quote, troubling on its face because she uses the phrase correctly, quote -- because she uses the phrase, quote,

Page 115

correctly believed.

So you characterized this as evidence of bias. Right? That's what -- pretty much what you just said, right?

A. I said that to me, for me reading it, it was troubling on its face. That's all I am saying. I am not opining that she did her survey wrong, I would let an expert who has some more expertise to Dr. Matthews critique her analysis and conclusions. I am just saying it is troubling on its face.

Q. Didn't you use the word bias in your report when you were talking about Dr. Matthews?

A. I am not sure.

Q. Paragraph 46 -- paragraph 45, "Even if Dr. Matthews' analysis were unbiased, Dr. Ingersoll failed to consider it."

So implying from that statement in paragraph 46, based on Dr. Matthews using the term correctly believed, you infer from that bias infecting the survey results and interpretations; is that fair to say?

A. I am just saying that it didn't come across as unbiased to me. It didn't come -- yeah, that's all I am saying.

Q. Okay. So you did read the portion of Dr. Matthews' declaration where she explains that she

Page 116

was asked to assume that the product is habit forming, and that the term, quote, correctly believed, reflects that assumption for analysis and reporting purposes.

A. I don't remember reading that.

Q. You read her report, did you not? It was in your list of materials.

A. I had her report, I didn't go through every single page of it.

Q. Okay. So I will direct you to paragraphs 135 and 136 on that. So if she had been asked to assume the opposite, that the product is not habit forming, the survey design would have been identical. She would have simply compared a different answer category.

Do you understand that?

A. I don't know whether that's true or not.

Q. Why not?

A. Well, I just told you, I don't design surveys.

Q. Okay. So the reason you found the "correctly believed" phrase troubling is because you believe it reflected a bias about the ultimate actual state of MIT45 kratom products, correct?

A. I just -- if there was a bias that she already had, and it was in her survey, then that's what I found troubling on its face. I am leaving it to an expert in her field to rebut her, but a cursory review of her

Page 117

30 (Pages 114 - 117)

Matthew A. Connors - April 27, 2026

Q. Okay.

A. And I guess we call -- we call our calculations models.

Q. And what's the methodology?

A. A theory, a concept.

Q. Mm-hmm. And what is your understanding of how those terms are used in the consumer class-action context?

A. I don't have an understanding, specific understanding.

Q. Okay. So when I asked you whether Dr. Ingersoll, having reviewed any of Dr. Matthews' results would change any of your other critiques about Dr. Ingersoll's model, can we agree that, in methodology, are interchangeable here and can I have a response?

A. Okay. So you want me to assume, when you are talking about his model, just his methodology? Because you understand, I think -- I haven't seen any calculations by Dr. Ingersoll.

Q. Let me just change the question.

If Dr. Ingersoll had reviewed Dr. Matthews' results, would that change any of your other critiques of his methodology?

A. I think there are probably -- I think there are

Page 134

things coming out of Dr. Ingersoll's analysis that maybe should have impacted his work. That's where I think he probably should coordinate with her.

Q. Can you think of any specific examples of things that you think he should have coordinated with her on?

A. I think I had some examples in my report. Let me -- so I am looking at paragraph 46.

Q. Okay.

A. Just -- you know, I saw a couple of statistics where Dr. Matthews' analysis indicated or seemed to indicate that a majority of the target market did not believed MIT45 was habit forming. And Dr. Ingersoll failed to explain how 19.3 percent of the Respondents surveyed by his colleague indicated that they would purchase a kratom extract that provides natural pain relief and energy, and also indicated on the label that it is habit forming and can cause opioid withdrawal symptoms. I think some of those type of factors that may come out of her analysis might be useful in calculating the damage.

Q. As going to that benefit offset issue we talked about earlier?

A. Yeah. I mean, the way I interpret that is 19.3 percent of the people said they would still purchase it,

Page 135

even if they knew it was habit forming.

Q. Mm-hmm. Would your criticism of -- you know, reflected in paragraph 46, and in paragraph 57 about the offsets, would it be resolved if you knew that Mr. -- Dr. Ingersoll had just been instructed by counsel to assume full refund for everybody?

A. I am not sure.

Q. Can you say why not?

A. Well, I guess I would have to coordinate with my counsel. And if they say, yeah, all that other stuff is off the table, then fine. But if there's an argument to be made that there has to be some offsets for, you know, what Dr. Ingersoll is calculating, then we would go further. I would discuss those offsets, and I think there's still a critique.

Q. I mentioned the term materiality, earlier.

Do you have any concepts on the terms -- I already said materiality, but let's use presumed class-wide reliance, in the context of consumer class-action cases?

A. I don't have any -- what did you ask, for a definition or -- I don't have a --

Q. Do you have any understanding or concept of what that means in the consumer class-action cases.

A. No.

Page 136

Q. Okay. All right. So paragraphs 36 through 38, you argue that Ingersoll fails to account for positive benefits received by consumers. Correct?

A. Yes.

Q. We just talked about that. You cite plaintiff LM's testimony that kratom helped reduce his use of pain killers. Correct?

A. Correct.

Q. And were you aware -- well, strike that.

How much of plaintiff LM's depo testimony did you read?

A. It's hard for me to differentiate all three of the deposition testimonies, because I don't know the people. But I think I generally read all three of the deposition testimonies.

Q. You read the entire transcript?

A. I think I did. I -- there may have been one I didn't get all the way through, but I don't remember which one it was.

Q. How much time would you estimate you spent reading deposition transcripts?

A. I don't know, a day or two.

Q. Okay. So -- all right. So you read presumably most of or, if not all of, the plaintiff LM's deposition transcript. So then you are aware that LM also

Page 137

35 (Pages 134 - 137)

Matthew A. Connors - April 27, 2026

account for the benefit, some benefit, in a benefit offset model that -- this or that determination is a legal question for the Court. Yes or no?

ATTORNEY CHRISTIANSEN: Objection to form.

THE WITNESS: That's a legal question for the Court. But in advance of the Court deciding that, if the counsel that hires me asks me to calculate something one way or the other, then I -- you would still perform the analysis and the Court can then later decide.

ATTORNEY BRADEN: Q. Got it. So the job of the economist or the financial expert is to -- if the lawyer says do a full refund or do a benefit offset model, the job of the economist or financial expert is to, you know, take the inputs and map out, you know, what that equation looks like?

A. Correct.

ATTORNEY CHRISTIANSEN: Objection to form.

THE WITNESS: I think as -- I think that there's got to be a lot of coordination there. Like in theory, I agree with what you are saying; but as an expert, I am also coordinating pretty extensively with the counsel that hires me to do the right calculation. And I might be saying, is this a part of the calculation, or can I get that? And maybe they are pushing back and saying, not applicable or, you know --

Page 142

so it is -- it is, the calculation is a coordinated effort, I guess.

ATTORNEY BRADEN: Q. Okay. So I want to -- just want to fully understand this.

So in addition to whether to, you know, ultimately use the full refund for benefit offset model being a legal question, additionally, some of the inputs into those equations or calculations should be a heavily coordinated effort between the finance expert, economist person, and the counsel that retained them; is that correct?

ATTORNEY CHRISTIANSEN: Objection to form.

THE WITNESS: I think that there's coordination for the calculation as things move along.

ATTORNEY BRADEN: Q. Does the economist finance expert -- is it common for them to defer to counsel on the appropriate input variables into the calculation?

A. I think it depends. I think it can get the financial or, you know, whoever is doing the calculation, I think it can get them in trouble, if the attorney is entirely guiding the calculation.

Q. Well, is there a healthy middle ground? Like where would you draw the line on that?

A. Well, I draw the line with what I am

Page 143

comfortable opining on and what goes into my analysis. And other experts may be comfortable with, you know, other things that go into their analysis.

Q. Okay. All right. So just to reiterate a few things. I think I am almost done here.

You are not offering opinion on class-wide damages -- strike that.

You are not offering an opinion that class-wide damages cannot be calculated in this case, are you?

A. It is possible that they can be calculated. I haven't seen a calculation.

Q. Okay. You are not offering an alternative damages methodology, are you?

A. Not at this point.

Q. You are not offering an opinion than Ingersoll's model is incapable of generating a class-wide damages figure, are you?

A. I have -- based on what he's outlined, I am not sure it is possible that he can do -- that he can get to the result he says he can.

Q. Is that because of the inputs that he's laid out?

A. It is, yeah, a lot of inputs that he's laid out. I am not sure he is -- I'm not sure the data that he has got contains what he needs.

Page 144

Q. Okay. So disputes -- okay, so those critiques go to the input data but not the structural possibility of a class-wide calculation, right?

ATTORNEY CHRISTIANSEN: Objection to form.

THE WITNESS: It is possible that a class-wide calculation can be done, I just haven't seen that he can do it.

ATTORNEY BRADEN: Q. Disputes about the inputs, like we said, the markup percentage, the data sources, adjustments for return, shrinkage, or spoilage, do you have any idea of whether or not those are questions that can be resolved with evidence at trial?

ATTORNEY CHRISTIANSEN: Objection; form.

THE WITNESS: I don't have an idea because I don't know what the evidence is. I would have to see the evidence first.

ATTORNEY BRADEN: Q. All right. You are not offering an opinion on whether kratom has value to consumers, right? You are just saying Ingersoll didn't analyze it. Is that right?

A. I am saying he didn't do any analysis in that regard.

Q. He didn't do any analysis in that regard, but whether or not kratom has value to consumers, that's not something that you are offering an opinion on, correct?

Page 145

37 (Pages 142 - 145)

866-299-5127          calendar-ca@veritext.com          www.veritext.com

**EXHIBIT 4**

Daniel Overbeek, MD

Expert Rebuttal Report

Prepared for:

Neal Deckant

Bursor & Fisher, P.A.

Regarding:

B.D., L.M., D.H., E.L. v. MIT45 Inc.

Prepared by:

Daniel Overbeek, MD

Rockford, MI 49341

Daniel Overbeek, MD                                                    Re: BD et al v MIT45

I.     Scope of Engagement

I have reviewed the following documents:

1. Plaintiff's Complaint, dated 03/14/24 and Plaintiff's First Amended Complaint, dated 12/10/24

2. Approximately 160 research studies provided by MIT45 in discovery, identified by their Bates number.

   a. MIT45_001951-002062

   b. MIT45_002359-004425

   c. Additionally, further studies as cited or discussed in Defendant's reports

3. "The Truth Behind Kratom" by Ryan Niddle, MIT45_009462-009480

4. Answer to First Amended Complaint, dated 12/23/24

5. Notice Of Motion and Motion to Dismiss; Memorandum of Points and Authorities in Support Thereof, dated 5/20/24

6. Plaintiff's discovery responses, including Plaintiff DH's Responses dated 03/20/25, Plaintiff EL's Responses dated 03/20/25, DH's 3rd Supplemental Responses dated 06/25/25, Plaintiff EL's 3rd Supplemental Responses, dated 06/27/25, and Plaintiff LM's Amended Responses, dated 06/27/25

7. Plaintiff Depositions – LM, dated 10/27/25, DH, dated 11/4/25, EL, dated 11/10/25

8. Defendant Reports – Dr. Christopher McCurdy, Mark Keegan, Matt H. Connors

9. Defendant Deposition – Dr. Christopher McCurdy, 4/29/26 and associated exhibits

10. Defendant Deposition – Ryan Niddel, dated 1/16/26 and associated exhibits

11. Photo of Product – "MIT45 Kratom Dietary Supplement"

2

Daniel Overbeek, MD                                                          Re: BD et al v MIT45

I am being compensated at a rate of $500 per hour for my work in this case. My compensation is not contingent upon my findings, and all conclusions are my own.

II.      Credentials

I am a board-certified physician in Emergency Medicine, Medical Toxicology and Addiction Medicine. I am currently employed as a Physician Consultant in Toxicology and Addiction Medicine with J.S. Held. I am involved in this manner in my personal capacity and not as an employee of J.S. Held.

I most recently practiced in the Corewell Health System in Grand Rapids, Michigan, as a Clinical Assistant Professor in the Department of Emergency Medicine at Michigan State University, and Cherry Health in Grand Rapids, MI. I left this role at the end of March of 2026 and will start a new role as a Medical Toxicologist and Addiction Physician at Wellness Plan Medical Centers in Detroit, MI, which will start this summer.

Medical Toxicology is the specialty focused on the care of patients with toxicologic issues such as intoxication or overdose, and Addiction Medicine is the specialty focused on the management of patients in all stages of Addiction including those with Opioid Use Disorder (OUD) and Kratom Use Disorder (KUD).

I practice and teach in the topics relevant to this case, including specifically regarding Kratom and Substance Use Disorders including Kratom Use Disorder and Opioid Use Disorder. I have cared for many patients who either use Kratom currently or have used Kratom in the past, and for many patients with complications of Kratom use including addiction, toxicity or withdrawal.

3

Daniel Overbeek, MD                                              Re: BD et al v MIT45

I completed a Bachelor of Science degree in Molecular, Cellular and Developmental Biology at the University of Michigan, and a Doctor of Medicine Degree at the Wayne State University School of Medicine. I completed residency in Emergency Medicine at the University of Michigan and the Harvard Medical Toxicology Fellowship in Boston, MA.

I am published on a wide variety of topics in Medical Toxicology, and am published in textbooks on both Emergency Medicine and Toxicology, as well as specifically regarding Kratom overdose and toxicity. My opinions in this report are based on my education, training and experience in Medical Toxicology, Addiction Medicine, and Emergency Medicine.

III.     Terms "Addiction" / "Substance Use Disorder" / "Physical Dependence"

In order to ensure that there is not confusion regarding the terms used here, I will briefly discuss the controversies in defining "Addiction" and associated terms. These controversies exist due to a desire to decrease the stigma associated with substance use disorders, as this stigma has significant impact on the care of patients with these disorders.

Due to this stigma, most academics and physicians engaged in Addiction Medicine use the term "Substance Use Disorder" (SUD) in place of "Addiction" as a less stigmatizing term, though the two terms are used interchangeably without significant distinction in definition. Some define "Addiction" as only including "Severe Substance Use Disorder" but this is a less common use.

"Addiction" is defined in multiple ways by those involved in addiction care / substance use care. The American Society for Addiction Medicine uses the following definition:

> *Addiction is a treatable, chronic medical disease involving complex interactions among brain circuits, genetics, the environment, and an individual's life experiences.*

4

Daniel Overbeek, MD                                              Re: BD et al v MIT45

*People with addiction use substances or engage in behaviors that become compulsive and often continue despite harmful consequences.*

The Diagnostic and Statistical Manual of Mental Disorders, Volume 5 (DSM-5) is published by the American Psychiatric Association and is used by psychiatrists and other physicians to define, diagnose and treat mental health conditions. The DSM-5 gives the following overarching definition: "The essential feature of a substance use disorder is a cluster of cognitive, behavioral, and physiological symptoms indicating that the individual continues using the substance despite significant substance-related problems."

This identifies the important components of an Addiction or Substance Use Disorder (SUD), that there are a cluster of symptoms, and that use continues despite these symptoms or even due to these symptoms.

The DSM-5 gives the following diagnostic criteria for an "Other Substance Use Disorder"

*A problematic pattern of use of an intoxicating substance not able to be classified within the alcohol; caffeine; cannabis; hallucinogen (phencyclidine and others); inhalant; opioid; sedative, hypnotic, or anxiolytic; stimulant; or tobacco categories and leading to clinically significant impairment or distress, as manifested by at least two of the following, occurring within a 12-month period:*

*1. The substance is often taken in larger amounts or over a longer period than was intended.*

*2. There is a persistent desire or unsuccessful efforts to cut down or control use of the substance.*

*3. A great deal of time is spent in activities necessary to obtain the substance, use the substance, or recover from its effects.*

5

Daniel Overbeek, MD                                    Re: BD et al v MIT45

*4. Craving, or a strong desire or urge to use the substance.*

*5. Recurrent use of the substance resulting in a failure to fulfill major role obligations at work, school, or home.*

*6. Continued use of the substance despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of its use.*

*7. Important social, occupational, or recreational activities are given up or reduced because of use of the substance.*

*8. Recurrent use of the substance in situations in which it is physically hazardous.*

*9. Use of the substance is continued despite knowledge of having a persistent or recurrent physical or psychological problem that is likely to have been caused or exacerbated by the substance.*

*10. Tolerance, as defined by either of the following:*

*a. A need for markedly increased amounts of the substance to achieve intoxication or desired effect.*

*b. A markedly diminished effect with continued use of the same amount of the substance.*

*11. Withdrawal, as manifested by either of the following:*

*a. The characteristic withdrawal syndrome for other (or unknown) substance*

*b. The substance (or a closely related substance) is taken to relieve or avoid withdrawal symptoms.*

The DSM-5 also defines the severity of a substance use disorder based on the number of these criteria met, "Mild" including the presence of 2-3 symptoms, "Moderate" including 4-5, and "Severe" including 6 or more.

6

Daniel Overbeek, MD                                                    Re: BD et al v MIT45

Based on this, an individual can meet the DSM-5 criteria for "Mild Substance Use Disorder" with only the last two criteria, Tolerance and Withdrawal. Some engaged in addiction care will use the term "Physical Dependence" when only these two criteria are met. The term "Physical Dependence" is not synonymous with Mild Severity Substance Use Disorder.

Kratom Use Disorder (KUD) has not been separately defined by the DSM-5, and as such, Kratom would fit under the category of "Other Substance Use Disorders." Academic studies and standard clinical practice have applied these diagnostic criteria to Kratom similarly to other substances that are not explicitly defined in the DSM-5.

Dr. McCurdy's deposition testimony defines addiction as well, stating "addiction is a form of dependence that has progressed to the point where someone has social issues, could be creating crimes, is doing things that they know are harmful to themselves despite understanding that harm and doing things that are harmful to others as well, in terms of seeking ways to obtain that substance." This definition does identify some components that would be included under the term addiction but is not sufficient to fully encompass all addictions.

IV.    Levels of Scientific and Medical Research and Evidence

In science and evidence-based medicine, there are multiple levels of research and evidence which all need to be considered when attempting to come to an optimal answer to an academic question. The highest strength of evidence will come from well-designed clinical trials, with randomized and controlled settings, appropriate statistical analysis and presented without bias. However, there are also many other types of studies and evidence which are still valid to be considered, ranging from large cohort studies, observational studies, case reports, animal studies and others, each with varying strength of evidence. Appropriate medical and scientific analysis

7

Daniel Overbeek, MD                                                    Re: BD et al v MIT45

will consider all of these types of evidence, noting that they each have their own limitations, and the strength of each piece of evidence will be considered in the context of those limitations.

In toxicology, this is especially relevant, as there are many topics of analysis which do not have randomized and controlled clinical studies available. This may be because the research has not yet been completed or that it may not be ethical (for example, it would not be ethical to give a large group of trial participants a potentially lethal overdose and then randomize treatment options). Additionally, with Kratom's relatively recent introduction into the US, there also hasn't been enough time for a large robust bank of randomized controlled trials to be completed. Because of this, many topics in toxicology, including Kratom, depend on observational studies, retrospective cohort analyses and case reports. These studies do not provide as strong of evidence as a randomized trial would, but they are regularly used in the practice of evidence-based medicine.

Additionally, when there are reasons why studies on a topic may inherently have a significant amount of structural bias which is hard to overcome, the full landscape of evidence from all sources must be considered. The realm of Addiction Medicine is a unique example of this, as almost all studies regarding drug use and addiction are at risk for significant biases in recruiting and reporting. This is due to the societal stigma regarding drug use, as well as the significant social and economic impacts of drug use influencing the subset of individuals who would be able and willing to join such a study. Due to this, addiction physicians and scientists will also use many sources for information which are non-traditional to try to consider the full landscape of information available. One example of this would be the use of observational evidence from online forums such as Erowid and Reddit. These forums are not controlled, posts are not

8

Daniel Overbeek, MD                                                    Re: BD et al v MIT45

validated, and users have a wide range of reasons and justifications for posting. However, this is still valid and useful information to be considered as a part of the whole.

Due to this, Kratom is a topic in which adequate answers to questions are often not available if only considering randomized controlled trials. So, physicians such as myself will use all of the information available to attempt to construct an optimized answer to the best of their ability.[1]

### V.    General Discussion of Kratom Use Disorder

Dr. McCurdy's report focuses on the distinction between physical dependence and addiction, concluding that Kratom can cause a physical dependence but not an addiction. I believe this is not an accurate conclusion about Kratom use in general or about the Kratom use from the named plaintiffs in this case. I will first clarify some of the points on Kratom use in general.

When studies have attempted to identify rates of KUD in Kratom users, they have found measurable and significant rates of reported KUD. One such study by Hill et al.,[2] as cited in my initial report, identified a prevalence of Kratom Use Disorder among survey respondents (an online survey of current Kratom users) of approximately 25%, with 20% of those meeting criteria for Moderate Kratom Use Disorder and 13.9% of those meeting criteria for Severe Kratom Use Disorder. Additionally, another study by Smith et al. from 2022[3] surveyed online respondents who reported lifetime kratom use, and identified 29.5% of respondents meeting past-year KUD, including 8.5% of all respondents meeting severe KUD criteria and 7.0% meeting moderate KUD criteria.

---

[1] Burns, Patricia B., Rod J. Rohrich, and Kevin C. Chung. "The levels of evidence and their role in evidence-based medicine." Plastic and reconstructive surgery 128.1 (2011): 305-310.

[2] Hill, K., Grundmann, O., Smith, K.E. and Stanciu, C.N., 2024. Prevalence of kratom use disorder among kratom consumers. Journal of addiction medicine, 18(3), pp.306-312.

[3] Smith, K.E., Dunn, K.E., Rogers, J.M., Garcia-Romeu, A., Strickland, J.C. and Epstein, D.H., 2022. Assessment of kratom use disorder and withdrawal among an online convenience sample of US adults. Journal of addiction medicine, 16(6), pp.666-670.

Daniel Overbeek, MD                                                                Re: BD et al v MIT45

These studies each have their limitations, which will always be considered when using survey data of substance use to attempt to diagnose Substance Use Disorders (including that they are online convenience samples and that stigma surrounding substance use can influence survey results). As such, the exact rate of substance use disorder may have some uncertainty, but these studies clearly identify that KUD/addiction can frequently be seen in those who use Kratom.  All of the individuals in these studies who meet moderate or severe criteria, and possibly some who meet mild criteria, are experiencing symptoms beyond solely "physical dependence."

Dr. McCurdy claims "the addictive potential of isolated kratom use is extremely limited as only 1 (one) individual of the 55 case reports evaluated by Smith et al., (2024) met the criteria for a KUD. The data shows that the risk of a severe KUD is extremely low."[4] This conclusion cannot be logically made from the case reports evaluated. The Smith 2024 paper states: "In our 2023 systematic review of clinical case reports comprising 55 published cases [15], we found that only one patient was formally evaluated for KUD using the DSM-5 framework, with a diagnosis of 'Other Substance Use Disorder, in Withdrawal,'" in order to conclude that clinicians should use a more standardized diagnostic criteria when diagnosing cases of KUD. It did not claim that the other 54 cases were of Kratom use without addiction, just that their publications did not include proof that the DSM-5 diagnostic criteria were followed. This review is from a systematic review published in 2023 by Smith et al.[5] (including Dr. McCurdy as a co-author) which concludes "case reports involving kratom should include standardized, complete assessments of relevant history and symptomatology and, where possible, assays for kratom's

---

[4] McCurdy report, page 4-5, citing Smith KE, Epstein DH, Weiss ST. Controversies in Assessment, Diagnosis, and Treatment of Kratom Use Disorder. Curr Psychiatry Rep. 2024;26(9):487-496.10.1007/s11920-024-01524-1

[5] Smith, K.E., Feldman, J.D., Schriefer, D., Weiss, S.T., Grundmann, O., Dunn, K.E., Singh, D., McCurdy, C.R., Butera, G. and Epstein, D.H., 2023. Diagnostic ambiguities and underuse of clinical assessment tools: A systematic review of case reports on kratom addiction and physical dependence. *Current Addiction Reports*, *10*(2), pp.282-292.

Daniel Overbeek, MD                                                    Re: BD et al v MIT45

bioactive alkaloids in patient biospecimens and kratom products." This study did not attempt to identify the rate of Kratom Use Disorder among users and as such cannot conclude that "the risk of a severe KUD is extremely low" as Dr. McCurdy claims.

Dr. McCurdy attempts to compare Kratom to caffeine, but this comparison does not hold up. Caffeine does lead to tolerance and withdrawal, but only in very rare cases does caffeine lead to the other cognitive or behavioral symptoms identified in Kratom Use Disorder. This is notably different than the experiences that some are having with Kratom, for some necessitating intensive addiction treatment such as residential detoxification programs (as discussed in my initial report, for example). We are not regularly seeing individuals spending tens of thousands of dollars on caffeine, losing control, being unable to quit in the same way with caffeine as we are with Kratom. Dr. McCurdy notes that caffeine products do not carry warning labels. A vast majority of individuals know that caffeine use can lead to dependence and withdrawal symptoms, making the scenario here different from such a situation.

None of this denies that some users identify therapeutic benefits from Kratom use or that some users feel that the benefits for use outweigh the other symptoms including dependence.

VI.    Named Plaintiffs

In this case, Dr. McCurdy claims that all of the named plaintiffs only have experienced physical dependence and not addiction.

As discussed below, I do not feel this is a correct conclusion based on the plaintiffs' descriptions of their symptoms. However, even if this is true, each of the plaintiffs have still experienced significantly impairing withdrawal symptoms which have affected their daily life.

11

Daniel Overbeek, MD                                                          Re: BD et al v MIT45

Dr. McCurdy also claims that the plaintiffs in this case do not meet criteria for Kratom Use Disorder, stating: "There are no claims of impaired control, social impairment, or risky use that put these individuals at risk of harm to themselves or others."[6] However, based on the information provided in discovery, each of the named plaintiffs has described behavioral or cognitive symptoms beyond solely tolerance and withdrawal, consistent with loss of control and other social/behavioral symptoms.

Each of the plaintiffs reported tolerance and dependence, experiencing significant and debilitating withdrawal symptoms when attempting to quit or cut down their Kratom use. Plaintiff L.M. reported that he began to use Kratom to attempt to quit other drug use, but found himself having multiple other undesirable effects from Kratom use. He also reported social and behavioral effects, including disrupted relationships and failed attempts to quit, as well as reporting impaired decision-making due to substance use. Plaintiff D.H. reported taking more than intended and difficulty cutting down / quitting. Plaintiff E.L. reported worsening mental health symptoms including depression and anxiety as a result of his Kratom use. He also reported that his Kratom use continued despite disruptions to his personal and professional life, that he spent more on Kratom than intending to, and has been unsuccessful in quitting multiple times due to withdrawal and cravings.

VII.    Other Discussion

Dr. McCurdy also points out that the issues in this case are complicated by polysubstance use, claiming that "the complex nature of kratom with multiple alkaloids each having multiple pharmacologies, makes this extremely complex. That extends to KUD in terms of complexity as

---

[6] McCurdy report, pg 5

12

Daniel Overbeek, MD                                                    Re: BD et al v MIT45

most often, kratom is consumed within the context of polysubstance use, and not as a single entity." As discussed in my initial report, Kratom use is often contextualized by other substance use. Simplifying, there are three common patterns of Kratom use: Kratom use *de novo*, without other associated drug use; Kratom use in combination with other substance use (either to increase the intoxicating effects, or to attempt to consume substances that are not identified on common drug tests such as workplace drug testing); and Kratom use as an alternative to other substance use (replacing other substances or to decrease withdrawal symptoms). This does make Kratom use a complex landscape, but does not change the underlying critical features of Kratom: that regular use can lead to dependence and addiction / Kratom Use Disorder.

Dr. McCurdy also claims that "[t]here has been a history of safe use in SE Asia" without expanding further on what he means by safe use. Kratom has been used for many years in Southeast Asia, usually as a chewed leaf or boiled decoction. Even though this use is usually at a lower dose than extract use in the United States, there are still reports of complications from this use in Southeast Asia. For example, regular use has in Malaysia been linked to symptoms of Kratom Use Disorder, including dependence, withdrawal, and cravings.[7]

VIII.    Conclusions

Dr. McCurdy's report does not refute the key facts about Kratom relevant to this case:

1. Regular Kratom use can lead to dependence with significant withdrawal symptoms when Kratom use is discontinued.

---

[7] Singh, Darshan, Christian P. Müller, and Balasingam K. Vicknasingam. "Kratom (Mitragyna speciosa) dependence, withdrawal symptoms and craving in regular users." Drug and alcohol dependence 139 (2014): 132-137.

Daniel Overbeek, MD                                              Re: BD et al v MIT45

2.  Regular use can also lead to Kratom Use Disorder (including Severe Kratom Use

    Disorder) in a subset of regular users with a constellation of cognitive, behavioral, and

    physiological symptoms.

These opinions are based on my education, training and medical experience, are based on the

information and documents provided to me, and may change if further information becomes

available.


Respectfully submitted,

Daniel Overbeek, MD

14

**EXHIBIT 5**

**UNITED STATES DISTRICT COURT**

**Southern District of California**

| | |
|---|---|
| Maria Moorhead, et al., | 3:24-cv-00499-L-DEB |
| Plaintiffs, | |
| - against - | |
| MIT45, Inc., | |
| Defendant. | |

**REPLY REPORT, ANDREA LYNN MATTHEWS, PH.D.**

1. This is a report by A. Lynn Matthews, Ph.D., to address various issues in reports offered by Mr. Mark Keegan and Mr. Matt Connors in the matter of <u>Maria Moorhead et al. v. MIT45, Inc.</u> (U.S. District Court for the Southern District of California). The compensation paid for my time for the study and testimony in this matter is $500 per hour, regardless of the outcome.

2. Mr. Keegan was asked to evaluate and opine on the study that I conducted and presented in my Declaration on behalf of the Plaintiffs in this matter. Mr. Connors was asked to evaluate and opine on the study that Dr. William Ingersoll conducted and presented in his Declaration, but also discusses the study that I conducted.

3. Both Mr. Connors and Mr. Keegan make erroneous claims about my study. Mr. Connors makes the erroneous claim that since I used the phrase in my analysis that a certain percentage of consumers "correctly believed" various attributes about the product in question that it shows a lack of objectivity or impartiality and indicates bias. In contrast, as explained my Declaration, I assume that the allegations in the complaint regarding the nature of the product's attributes are correct for the purposes of analysis and reporting. These assumptions did not bias the design of the questionnaire, as the goal was to obtain an accurate estimate regarding the number of respondents who had "correct" versus "incorrect" beliefs across different stimuli. My report is objective and designed to accurately capture consumer beliefs and preferences.

4. Mr. Keegan inaccurately states that "The Matthews Study is so fundamentally flawed in design and execution that no valid or reliable conclusions can be drawn from the

data." He then lists eight supposed flaws of the study that allegedly support this statement. None of his eight points are accurate; instead, they are based on a misunderstanding of the assignment, a misunderstanding of proper survey methods, and/or a conflation of valid methodological differences between experts with flawed methodological practice. Instead, my study was a well-designed survey experiment that followed industry and academic best practices, resulting in valid and reliable conclusions. Specifically:

5. Contrary to the assertions of Mr. Keegan, I did not target an overly broad survey universe, but rather the correct survey universe. I discuss this point in greater depth below.

6. Contrary to the assertions of Mr. Keegan, my survey methodology was not flawed or leading, but rather focused and precise. My methods lead to correct and accurate estimates. I discuss this point in greater depth below.

7. Contrary to the assertions of Mr. Keegan, my answer options were mutually exclusive and exhaustive, not incomplete. The "reading test" format I used is correct for this type of analysis. These methods are not leading. I discuss these points in greater depth below.

8. Contrary to the assertions of Mr. Keegan, my design replicates the relevant marketplace environment in relevant dimensions, while preserving internal validity that is necessary to establish causality. I discuss this point in greater depth below.

9. Contrary to the assertions of Mr. Keegan, my survey stimuli were appropriate for answering questions regarding both deception and materiality. Consumers who were answering questions about their beliefs about the product were shown the MIT45 packaging. Consumers who were answering which of two products they would purchase that were identical except for the allegedly material attribute did not need to see packaging to accurately and validly assess the materiality of whether the label indicated that the product was habit-forming. I discuss this point in greater depth below.

10. Contrary to the assertions of Mr. Keegan, my sampling plan was not incorrect. While Mr. Keegan presents an alternative sampling plan that has its own benefits and drawbacks, the sampling plan I used was equally correct and effective at obtaining data that allowed me to assess and control for the impact of demographic variables on the results. Because of this, my results are projectable to the broader population of likely purchasers of kratom products. I discuss this point in greater depth below.

11. Contrary to the assertions of Mr. Keegan, I did not fail to disclose any important or relevant information that I possess. I accurately stated that I hired Qualtrics to obtain panel participants. The fact that Qualtrics selected one or multiple survey vendors to obtain panel participants and employed its own data scrubbing

techniques is neither unusual nor problematic. I discuss this point in greater depth below.

12. Contrary to the assertions of Mr. Keegan, my survey does not show that harm across the proposed class of consumers is not uniform. Mr. Keegan inexplicably includes customers who indicate that they would NOT buy either kratom product in his statement that "over half of all relevant consumers have no specific preference for a kratom product that does not include disclaimer language." These respondents have indicated that they are not, in fact, consumers of the product as they would not choose to purchase the product at all. When removed from the sample, as I properly do in my Declaration, the results show that 62.1% of the sample would prefer to purchase a kratom product that does not indicate that it is habit forming. I discuss this point in greater depth below.

13. In sum, Mr. Connors and Mr. Keegan make inaccurate and misleading statements about my work, which either reflect an inaccurate understanding about the nature of my assignment, a lack of understanding regarding proper methodologies, or a desire to mislead the court. My study was designed based on academic and industry best practices, as laid out in my Declaration, and analyzed and presented in an objective and unbiased way. The results of my study are therefore valid, reliable, and an accurate depiction of consumer perceptions and preferences in this matter.

## Mr. Connors Inaccurately Conflates Correct Reliance on Assumptions with Bias

14. Mr. Connors states that my work is "troubling on its face" as I test the percentage of individuals who "correctly believe" that the MIT45 Kratom extract product was habit-forming. He states that the use of this terminology suggests that my work is biased: "to the extent that MIT45 disputes what Dr. Matthews has already determined is 'correct,' there is risk that bias infects her survey, results, and interpretation." This statement is made without evidence and conflates reliance on assumptions provided to me with conducting biased work. In contrast, while my work correctly and necessarily relies upon assumptions, it is conducted objectively and without bias.

15. As per my Declaration, my work relies on assumptions provided to me by plaintiff counsel, including that all information presented in the complaint is factually correct. Among these assumptions is that the MIT45 Kratom extract product is habit-forming. These assumptions do not inherently cause bias, as my task was to identify consumer perceptions regarding what is true of the product, and consumer

preferences for kratom products with a given attribute (warning label) versus products without that attribute. These research questions are independent of any assumptions that I have been given about the product.

16. As stated in my Declaration, "For our analysis, we have been asked to assume that the Defendant's Product is both habit-forming and can cause opioid withdrawal symptoms. We thus assume that answering in this way reflects a correct belief regarding the nature of the product...In our analysis, we examine the proportion of individuals who believe that the product is habit-forming and that repeated use can cause opioid withdrawal symptoms compared to all others who answered the question."

17. Thus, as stated above, my use of the term "correct belief" is used for analysis and reporting purposes specifically based on assumptions I was given. If I had been presented with different assumptions, such as, for instance, that it was correct to believe that the product was NOT habit-forming and that repeated use does NOT cause opioid withdrawal symptoms, I could have used an identical instrument with identical fielding, and simply compared the percentage of individuals who selected the answer "not habit forming and repeated use does not cause opioid withdrawal symptoms" to the percentage of individuals who selected any other answer choice. These percentages could be accurately computed based on the results presented in Appendix E: Tables Used in Analysis. In other words, the assumptions I was given impacted which answer choice was used as the comparison category, but not the method in which the data were collected or the underlying results.

18. Thus, there is no merit to Mr. Connors' statement that "there is risk that bias infects her survey, results, and interpretations" because of the assumptions I was given. The data and results would have been identical regardless of assumptions about the product's habit-forming nature.

# Mr. Keegan Inaccurately States That I Targeted an Overly Broad Survey Universe

19. My survey universe was defined as "adult US consumers of herbal supplements, herbal medicines, recreational drugs, or pain relievers," who had purchased at least one of these products in the past 12 months. Mr. Keegan inaccurately states that "this target population is fundamentally flawed because it is grossly overinclusive, including swaths of individuals whose opinions are not relevant to the current matter."

20. Mr. Keegan argues that "an appropriate survey universe for the Matthews Study would have been likely purchasers of kratom, or, because there is a proposed Class of MIT45 purchasers, likely or actual purchasers of the Defendant's products."

21. Mr. Keegan is incorrect in his assessment. For this matter, the proper survey population of interest includes the target population for the product. This properly includes all individuals to whom the product is marketed. Per Diamond and Swann (2022), "A survey testing whether an advertisement likely misleads or deceives consumers should focus on those consumers to whom the ad is directed (i.e., the advertiser's potential customers)" (p. 41). This population is broader than Mr. Keegan's proposed universe of only past purchasers or likely purchasers.

22. It is my understanding that kratom is marketed to customers of pain relievers, herbal supplements, herbal medicines, and recreational drugs. Individuals who are seeking the benefits of finding an alternative to other pain-relief medication, over-the-counter supplements, natural medicines, and products to help get off of opioids, are thus all in the target market for kratom. This includes, as Mr. Keegan indicated, individuals who have previously purchased over-the-counter pain medication such as Tylenol or Advil, as they would be considered potential users of kratom since they desire the benefits of pain relief that are marketed by kratom.

23. Mr. Keegan inexplicably argues that since "the vast majority of purchasers of pain relievers," "herbal medicines," and "recreational drugs" have not purchased a kratom product, that they are not in the target market for this product. This argument incorrectly excludes purchasers of competing products (pain relievers, herbal medicines, recreational drugs) from the target market for kratom, which is not standard marketing practice. As a member of the American Marketing Association, Mr. Keegan should know that a target market often includes consumers of competing products in the product category, especially when the competing products offer similar benefits to the focal product. A survey that is designed to capture consumer perceptions of kratom should therefore be targeted at all recent consumers of pain relievers, herbal supplements, herbal medicines, and recreational drugs, as I understand that these are all competitors for kratom products that offer similar benefits to those that kratom allegedly offers.

24. Further, for a product that is allegedly addictive, it becomes even more important to identify the beliefs of respondents who are in the target market for kratom but who have not yet purchased the products. Individuals who have begun using a product that is allegedly addictive may change their perceptions about the product based on their own personal experiences rather than because the label gave an accurate warning regarding the product's addictive nature. It is therefore important to capture

the perceptions of all members of the target market of kratom and not only those who have previously purchased the product.

## Mr. Keegan Inaccurately States that I Employed a Flawed, Leading Survey Methodology

25. Mr. Keegan agrees with me that leading questions are to be avoided, and acknowledges that I said as much in my Declaration. However, he then gives an inaccurate definition of leading questions that his quotations and citations fail to support that leads him to inaccurately state that my survey methods are leading.

26. Mr. Keegan correctly quotes Professor McCarthy as indicating that question designers "must resist the temptation to lead responses to a desired end or to 'help' the witness to reach the 'correct' answer," and Professor Diamond as saying that leading questions "may threaten the validity of the survey by systematically distorting responses if respondents are misled in a particular direction." In light of these well-known principles, I crafted my survey questions to ensure that respondents were not led toward or away from any particular response option.

27. Mr. Keegan then mistakenly states that leading questions are those that establish "a hyper-focus on the issue of product labeling in the instructions and question language presented to respondents." He thus conflates the issue of focusing respondents on a particular *topic* with leading respondents to *answer* a given question in a particular way.

28. This incorrect conflation of question focus and question bias has been dispelled by Jacob Jacoby, whom Mr. Keegan quotes in his own report as a reliable source. As eloquently expressed by Jacoby:

29. "All questions necessarily lead respondents to think in terms of the subject matter posed by the question – sometimes, regarding issues the respondent might not have considered without being stimulated by the question. That is the primary and necessary function of survey questions – to focus the respondent's thoughts on the issue of interest. The alternative to asking questions that guide thought is for the questioner to stare at the respondent hoping that, somehow, someday, the respondent will spontaneously provide an answer to the question the researcher has in mind.

30. "What makes a question a leading question is that it does more than cause a respondent *to think* in terms of the subject matter posed by the question; it also guides or biases the respondent *to answer* one way rather than another. This can be accomplished in one of two general ways – either by making one or more responses (or response options) *more* likely to be selected than others, or by making one or more responses (or response options) *less* likely to be selected than others. All questions lead respondents to think; this

does not make them leading questions. <u>It is only when a question leads you to *answer* one way rather than another that it is considered leading.</u>"[1]

31. Mr. Keegan takes issue with the fact that my survey allows respondents to discern that "the primary issue of importance in the study is product labeling," an alleged "problem" of survey focus that, if correct, would invalidate the majority of market research on product labeling. In fact, it is standard practice for many surveys to state the general topic of their study so that respondents can have an accurate assessment of what they are being recruited for. While it is important in litigation surveys to ensure that respondents do not know who is conducting the study or that the study is being conducted for litigation, those issues are entirely separate from focusing respondents correctly on the topic of interest – in this case, their perceptions and beliefs regarding a product based on its label, and their preferences for a product based on an allegedly material attribute.

32. Mr. Keegan specifically asserts in the deception conditions that because I instruct respondents to read the product label and answer "based only on the product label," that the question regarding perceptions is "leading and biasing." This is untrue. Instead, the question specifically focuses on the piece of information I was tasked to collect: namely, what do consumers believe to be true about the product based on the information presented on the label, and how does that change (if at all) when a warning label is added? My survey correctly, accurately, reliably, and precisely collects that information.

33. Mr. Keegan makes similar arguments regarding the materiality measurement that "respondents would be expected to be hyper-focused on the product labeling issue." It is correct to say that respondents will be focused on the product labeling issue, but which product they choose should not be impacted by focusing them on the issue at hand. I agree with Mr. Keegan that "it is entirely possible that some...MIT45 purchasers have no opinions, beliefs, or preferences regarding the messaging that appears on MIT45's labeling." That is why I gave respondents the option of indicating that they had no preference between the two products, or that they "don't know." Thus, my question correctly focused on the issue at hand, and my response options allowed respondents to correctly indicate their answer, without biasing respondents to give any particular answer.

34. Mr. Keegan strangely takes issue with the fact that I asked a follow-up question to respondents who indicated that they had no preference between Kratom Extract Shot A and Kratom Extract Shot B. He states that "this follow-up question is extremely susceptible to acquiescence bias, as it suggests to the respondents that "no preference" was not the desired answer," and that "the data from this question is inherently unreliable." This is incorrect, as acquiescence bias refers to respondents being more likely to say "yes" than "no" to any given question (to acquiesce), or suggests a particular *answer* to respondents who will then seek to

---

[1] AMER. BAR ASSOC., TRADEMARK AND DECEPTIVE ADVERT. SURVEYS: L., SCI.AND DESIGN 273 (Shari Seidman Diamond & Jerre B. Swann, eds., 2d ed. 2012) (italics in original; underlining added).

"agree" with what they believe the researcher is looking for (Diamond and Swann 2022, p. 277). However, the follow-up question provides both Extract Shot A and Extract Shot B as alternatives and there is no reason to believe that respondents would be more likely to select one than the other simply because they were pressed to make a choice.

35. There is also no reason to believe that the choice that respondents make in this scenario is fundamentally unrepresentative of the choices they would make in an actual purchasing scenario: in a real shopping scenario, if a shopper sees on the shelf two product choices and they don't have a strong preference for one versus the other, they will ultimately need to make a choice of purchasing one or the other, or walking away and not purchasing either. Those are the same answers that I give respondents in the survey, along with "don't know." Thus, there is no evidence to suggest that the follow-up question is unreliable.

36. Mr. Keegan further incorrectly states that my questions are unbalanced. This is simply untrue. He makes this claim based on the fact that I ask respondents, "which of the following do you think is true about this product?" instead of asking, "which of the following, if any, do you think is true about this product?"

37. As Jacob Jacoby correctly states, "questions become unbalanced...when they explicitly mention one or more, but not all, of the most likely or plausible response options." For instance, if a researcher were to ask a respondent, "which of the following colors (e.g. red, blue) is your favorite?" with answer options of red, orange, yellow, green, blue, and purple, that question would be unbalanced as it draws undue attention to two of the answer options (red, blue).

38. My question, which asks respondents which of the following options are true, is not unbalanced. It does not draw attention to any of the specific options, but allows respondents to make up their own minds. It did not need to include the verbiage "if any," since my answer options are exhaustive, meaning that *all respondents can select an answer option that they believe is true*. Specifically, my answer options included:

   a. This product is <u>habit-forming,</u> and repeated use <u>can cause</u> opioid withdrawal symptoms.
   b. This product is <u>habit-forming</u>, but repeated use <u>does not cause</u> opioid withdrawal symptoms.
   c. This product is <u>not habit-forming</u>, but repeated use <u>can cause</u> opioid withdrawal symptoms.
   d. This product is <u>not habit-forming</u>, and repeated use <u>does not cause</u> opioid withdrawal symptoms.
   e. Don't know
   f. Other
   g. None of the above

39. The inclusion of three separate nonsubstantive options (don't know, other, none of the above) apart from the four substantive options given ensures that respondents can select an answer that they believe is true. Even if leaving out the verbiage "if any" pushed respondents to select one of the four substantive options given, there

is no reason to believe that respondents would be more or less likely to answer that the product was habit-forming or that repeated use could cause opioid withdrawal symptoms.  Therefore, this question is not biasing and instead allows for an accurate measurement of consumer perceptions regarding the product's attributes based on the label's wording.

## Mr. Keegan Inaccurately States that I Employed Additional Leading Survey Techniques, Including Incomplete Answer Options and an Inappropriate Reading Test

40. Mr. Keegan then incorrectly states that my questions make use of "incomplete answer options which fail to present respondents with all possible answer choices" and that they are "not exhaustive." This is untrue. Mr. Keegan apparently is conflating the correct statement that exhaustive answers allow respondents to accurately choose a statement that describes their view, with a laughably incorrect statement that researchers must provide a separate answer option for any potential answer that respondents might believe.

41. Correct survey methodology notes that answer options can be made exhaustive by including an "other" or "none of the above" option, so that any respondents who believe something other than what is listed in the substantive answer options can still accurately answer the question. To ensure that my deception survey was exhaustive, I chose to include three non-substantive options: "don't know," "other," and "none of the above."

42. If one were to need to include every possible permutation or shade of meaning into different answer options to allow every possible respondent to give the answer that best fits their beliefs, instead of grouping them into an "other" or "none of the above" category, survey research would be implausible as one would need to a priori identify every possible answer that a respondent might give, no matter how unlikely. For instance, a survey question regarding respondents' favorite color could not simply use as answer options, "red, orange, yellow, green, blue, purple, other," but would have to specify each gradation of each color, of which there are literally thousands.

43. Instead, survey methodology best practices state that researchers should identify the *most likely* answer options, or the answer options that are *substantively of interest* to the research question, and then allow respondents to state "other," "none of the above," or "don't know" if their answer does not fall into one of those categories. These best practices are what I followed in my survey.

44. My preferences survey included a choice task. Choice tasks are fundamentally different from asking respondents about their perceptions of what a label means, as the respondents are asked about which of two product options they would

purchase, if given the choice. To ensure that my preferences survey was exhaustive, I included the options:

   a.  Would purchase Kratom Extract Shot A
   b.  Would purchase Kratom Extract Shot B
   c.  Would have no preference between Kratom Extract Shot A and Kratom Extract Shot B
   d.  Would not purchase either of these options
   e.  Don't know

45. This gives every respondent an answer that is correct for them. Mr. Keegan's statement that some respondents might choose to purchase both extract shots is nonsensical: if respondents *have no preference* between the two products, then they can choose the option that says that they have no preference. If they *don't know* what they would do, then they can choose "don't know." Otherwise, they would have a preference and that preference would lead them to indicate that they would purchase either extract shot A or extract shot B.

46. Mr. Keegan incorrectly indicates that the answer of purchasing both "is also the answer that might be expected to be selected most often by a respondent who has little or no interest whether the MIT45 product label does or does not include a disclaimer." However, any respondent for whom this is true is given the answer option of: "Would have no preference between Kratom Extract Shot A and Kratom Extract Shot B." I thus anticipated and included a response category for respondents with this belief.

47. Mr. Keegan also takes issue with the side-by-side format used in the materiality survey based on an inaccurate application of trademark survey standards to consumer deception and materiality surveys. Specifically, his statement that "it has been long established in surveys conducted for litigation that it is inappropriate to present study stimuli in a side-by-side format" is only relevant when researchers are attempting to study consumer confusion due to trademark similarity. I agree with the quote by Professor Jacoby put forward by Mr. Keegan that if one is attempting to identify whether consumers of a particular product believe that a product is put out by a similar company, then placing two trademarks side by side may unduly reduce consumer confusion.

48. However, this is not at all what is being asked in a materiality survey. A materiality study is specifically designed to test whether a particular attribute impacts consumer behavior regarding the product. Thus, a within-groups choice-task that measures consumer behavior as driven by the particular attribute in question, is an excellent and appropriate design for accurately capturing what percent of consumers find the attribute to be material.

49. Mr. Keegan takes issue with the "reading test" design of the study. However, it is my understanding that all questions pertaining to consumer perceptions or preferences can be categorized as either "reading tests" or "memory tests." Reading tests are those in which the label or attributes in question are available for the respondents to refer to, while memory tests are those in which the respondent is shown stimuli and then asked questions after without being able to refer to the stimuli. It is therefore

necessary to identify which format fits best with the research question at hand. In this case, it is more externally valid to conduct a reading test than a memory test. Consumers in a store are able to look at and refer to a label, and to compare products to each other, without having to remember what was true about a product versus the other. While a reading test might create bias if the goal of a study is to identify whether consumers notice or remember a particular attribute, it does not create bias when the goal of the study is to identify what consumers believe to be true based on the text of a label, or which of two otherwise identical products consumers would choose to purchase when they vary on one allegedly material attribute.

50. Mr. Keegan takes issue with the within-groups methodology that holds all conditions constant except for the allegedly material attribute. However, this is standard experimental design and practice, and is the only way to assess whether a given attribute is, on its own and apart from any other attributes in the product, material to consumers' behaviors.

## Mr. Keegan Inaccurately States that I Failed to Replicate the Relevant Marketplace Environment

51. Mr. Keegan argues that my survey fails to replicate the relevant marketplace environment. This argument is incorrect, as I replicate the dimensions of the marketplace environment that are relevant for assessing consumer beliefs about a product based on its label, and their preferences for kratom products that contain (or do not contain) a given attribute. No study can fully replicate marketplace conditions and still provide causal inference that is statistically valid. As such, I focus on replicating the important elements of marketplace conditions while preserving the study's internal validity.

52. The purpose of the materiality study was to test, while holding constant all other attributes of the product, whether the presence of a warning label was material to individuals who would purchaser kratom products. It is not necessary to show a product label for a product to correctly test this attribute in a way that is generalizable to actual consumer behavior.

53. Mr. Keegan has not identified any specific way in which deviations from marketplace realism in my study (e.g. providing "hyper-targeted" information about the label disclaimer) would bias respondents to select one kratom shot versus the other, versus indicating that they would have no preference, would buy neither, or don't know. Any deviations that simply add variance, rather than bias, would have detracted from the statistical significance of my study and increased the confidence intervals reported, but would not have changed the means or percentages reported.

54. My study is done in the correct context: kratom drinkable extract shots, which "contain natural kratom," are priced at $19.99, have a quantity of 10 ml, and offer

natural pain relief and energy. Asking respondents to imagine that they are at a store and viewing a product is a common and appropriate way in marketing research to test consumer perceptions regarding a product. Thus, my study shows sufficient marketplace realism to provide valid, generalizable results.

## Mr. Keegan Inaccurately States that I Presented Respondents with Inappropriate Survey Stimuli

55. Mr. Keegan argues that I "presented respondents with inappropriate survey stimuli which did not accurately present the Defendant's product as it would be viewed by respondents at retail, with some respondents never seeing the MIT45 packaging at all." I disagree; my stimuli were scientifically valid and appropriate for both the deception survey and the materiality survey.

56. In the deception survey, Mr. Keegan takes issue with the disclaimer language used in the edited condition, stating that it "fails to accurately simulate what a consumer would consider in an actual marketplace environment." Mr. Keegan therefore fails to understand the purpose of an experimental study in a consumer deception case, which is to test a non-deceptive label against an allegedly deceptive one and identify differences in consumer perceptions. The disclaimers present on the allegedly deceptive label state, "Caution: Mitragyna Speciosa Extract can be much more powerful than whole leaf kratom powder," and "These statements have not been evaluated by the U.S. Food & Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any disease. The FDA has not yet approved this product for human consumption." The research question I was tasked to test is whether these disclaimers cause consumers to believe that the product is habit-forming and can cause withdrawal symptoms at the same rate as when an additional disclaimer with information about the product's habit-forming nature is present.

57. My study found statistically significant differences in consumer perceptions that kratom products were habit-forming and could cause withdrawal symptoms when they were presented with the label as consumers would currently consider it in an actual marketplace environment, versus a label that was edited to be non-deceptive by adding a disclaimer label.

58. Other disclaimer labels that were accurate and non-deceptive could have been used in the study, as there are many correct ways to potentially inform consumers that a product is addictive and can cause withdrawal symptoms. It was not my assignment to develop a stimulus that a firm would ultimately use; it was my assignment to develop a stimulus that could plausibly be used, and that was

accurate and non-deceptive. I succeeded in that assignment and the results of the experiment show that the stimulus without the additional warning does cause a difference in consumer perceptions compared to the stimulus with the additional warning. Thus, my results show that the label in current marketplace conditions does not communicate the same information regarding the product's attributes as does the label with the additional warning.

59. In the materiality study, the purpose of the study was not to capture perceptions about a particular label, but rather to identify whether or not the attribute of the label stating that "the product is habit-forming and repeated use can result in opioid withdrawal symptoms" is material to consumers of the product with the attributes discussed above. By holding all attributes constant across the two products except for its potentially habit-forming nature and withdrawal symptoms, I was able to causally determine whether this attribute was material to consumers. Any labeling elements or additional disclaimers present on the product would have also been held constant, and so would not have impacted the experimental results.

60. Mr. Keegan states that my design creates acquiescence bias, as the "presentation" of the two products "casts the product with the disclosure in a comparatively negative light and suggests the desired response – i.e. a preference for the product without the disclosure – to the respondent." Since I use balanced language, counter-balance the two product options, do not use emotionally laden language, provide anonymous reporting, and otherwise follow best practices for objective data collection between the two product options, there is no reason to believe that acquiescence bias is occurring. Instead, it seems that Mr. Keegan agrees with my own study findings that a product that is not habit forming and does not cause opioid withdrawal symptoms is, in fact, on its face preferable and that this attribute is quite material to consumers.

61. Further, while Mr. Keegan identifies some minor typographical errors in the survey, such as identifying kratom shots as kratom capsules in a summary table in one stimulus, these issues should increase the variance of survey results rather than bias responses given to any question. They therefore do not impact the validity of the survey's results. (It should also be noted that this particular typographical error occurred only in a summary table while the product was correctly described in both the question wording and the answer wording in that portion of the stimuli, thus making it extremely unlikely that respondents were actually confused.)

62. Thus, the experimental stimuli in the materiality survey were appropriate and led to experimentally valid results that can be applied to all kratom shots that have similar attributes to those listed in the experiment (e.g. price, quantity, benefits offered).

## Mr. Keegan Inaccurately States that I Executed an Incorrect Sampling Plan

63. Mr. Keegan states that he is "unaware" of reasons that I would choose to oversample from California or New York, and that he has "reviewed no information" to indicate that U.S. Census quotas should be used as a sampling plan. Because of this lack of awareness and knowledge, he asserts that my sampling plan is incorrect. However, the ability to identify a sampling plan that has different benefits and advantages, such as the one that Mr. Keegan presents, does not mean that my different sampling plan with different chosen benefits and advantages is incorrect.

64. Instead, my sampling plan is valid and allows for statistical precision for specific demographic categories in a way that Mr. Keegan's would not. Specifically, U.S. Census categories were used to be able to control for each demographic variable in question with a known level of precision. As such, I was able to include all demographic variables in my logistic regression tests and assess whether or not they statistically impact consumer perceptions of and preferences for kratom products. If I had used Mr. Keegan's method of allowing "natural fallout," the percentage of individuals in any given demographic category would have been unknown a priori and I might have been unable to statistically identify differences across demographic categories with an adequate level of precision.

65. More importantly, my chosen method allowed me to control for any impact of demographic variables in my statistical tests to separate out this impact from the impact of the experimental stimulus (warning label). When I completed these analyses, the mixed GLMM showed that none of these demographic variables impacted consumer perceptions of what was true about the product based on its label. Thus, my results indicate that taking a sample using a different sampling plan likely did not impact the percentage of consumers who believed that the kratom was habit-forming or caused withdrawal symptoms.

66. I oversampled from California and New York as Plaintiff's counsel requested that I collect a sample that would allow me to conduct statistically valid subgroup analyses from these states. The subgroup results for California are included in the appendix of my report. Region was not a statistically significant indicator of either consumer perceptions (mixed GLMM results) or of preferences (logistic regression), indicating that there is no reason to believe that changing the sampling frame by region would impact the obtained results. These results support our chosen sampling plan approach and indicate that an alternative sampling plan would have been neither necessary nor beneficial.

# Mr. Keegan Inaccurately States that I Failed to Disclose Important, Relevant Information Regarding the Survey Panel Vendor and Data Scrubbing Procedures

67. Mr. Keegan takes issue with the fact that I described Qualtrics as a panel provider rather than a panel aggregator. This is a pedantic issue of semantics and does not indicate a failure to disclose any important or relevant information. Qualtrics is a reputable market leader for data collection who market themselves as offering "best-in-class" services including representative samples for any desired target population (https://www.qualtrics.com/research-services/online-sample/). This can accurately be described in other words as providing panels of respondents to researchers based on their desired target population. Or, as I termed it in my report, a "panel provider."

68. There is no reason to believe that any specific panel chosen by Qualtrics or data scrubbing conducted by Qualtrics would add bias to the survey, since the survey was conducted in a double-blind fashion. Any issues due to quality variability inherent in a sample would increase the variance of study results and decrease the likelihood of finding statistically significant results. Since my study found statistically significant results, any issues raised by Mr. Keegan only indicate that the actual size of the effects I found may be larger than what was identified in my survey.

69. I did not fail to disclose any information that was important or relevant. I accurately stated that I "hired a research vendor, Qualtrics, to recruit participants." I further stated that "453 [respondents] were identified as low quality respondents or bots and removed by Qualtrics' quality assurance team." This process of hiring a firm to provide high-quality final data is standard in marketing research and does not bias the results.

70. Mr. Keegan incorrectly alleges without evidence that hypothetical data source or quality issues "undermine the validity and reliability of the survey findings and conclusions" and that "it is unknown whether the Matthews Study data is representative of the actual opinions and beliefs of relevant consumers." This is untrue, as all respondents passed screening criteria by indicating that they were adult US consumers of pain relievers, recreational drugs, herbal supplements, or herbal medicines. Thus, my sample was composed of relevant consumers. Any data quality issues would not speak to the project's validity, and would have led to lower reliability in terms of higher confidence intervals and higher p values in statistical

tests than was true in the actual population. Therefore, the results present a valid estimate that is, if anything, conservative.

## Mr. Keegan Inaccurately States that My Study Shows That Harm Across the Proposed Class of Consumers is Not Uniform

71. Mr. Keegan inexplicably states that "over half of all relevant consumers have no specific preference for a kratom product that *does not* include disclaimer language." This metric reflects Mr. Keegan's incorrect choice to include as part of his definition of "relevant consumers" individuals in the materiality survey who indicate that they would purchase neither of the two kratom products offered. Individuals who would not purchase a particular product should not be included in an assessment of materiality for that product, which is why I dropped these individuals from analysis in my Declaration. As I stated in my Declaration, a correct calculation shows that 62.1% of individuals who would choose to buy a kratom extract shot would prefer a product that does not indicate that it is habit forming and can cause opioid withdrawal symptoms. In contrast, Mr. Keegan's statement that 54.2% of "all respondents" gave a different response is misleading due to its inclusion of individuals who would not purchase kratom products.

72. The illogical nature of Mr. Keegan's decision can be seen through a hypothetical example. One can imagine a new product that cures cancer. This product could have many potential attributes that would be likely material (i.e. impacting consumer behavior regarding product purchase or use), including for instance how much pain or discomfort is associated with the product's use. One could hypothetically imagine two versions of a product that cured cancer: one that caused a large amount of pain, and one that caused only mild discomfort. If individuals who *did not have cancer* were shown these two otherwise-identical products, they would most likely indicate that they would not purchase either – because they do not have cancer. This would not mean that the amount of pain associated with the treatment was immaterial to the product's target market; it would simply identify that these individuals were *not in the target market for the product*.

73. Instead, to calculate the percentage of individuals in the target market who would choose a product with a given attribute versus a product without that attribute, one must first drop all individuals who self-select that they are *not in the target market for the product* by indicating that they would not purchase either version of the product. Then one can calculate the percentage of the individuals in the target

market who would purchase Product A, Product B, who would have no preference, or who don't know which they would purchase.

74. As noted above, when one calculates the preferences for individuals who are in the target market for kratom, after excluding the 50 individuals in the sample who indicated that they would not purchase *either* product, one finds as reported in my declaration that 62.1% of the sample (87/140 individuals) would prefer to purchase the product that does not indicate that it is habit forming and can cause opioid withdrawal symptoms. Thus, Mr. Keegan's statement should be reversed: over half of all relevant consumers have a specific preference for a kratom product that does not state that it is habit-forming and can cause opioid withdrawal symptoms. Thus, the omission on the label of a statement that the product is habit-forming and can cause opioid withdrawal symptoms is material to over half of all consumers who indicate that they would purchase a kratom extract shot.

## Concluding remarks

75. Contrary to the erroneous comments put forward by Mr. Connors and Mr. Keegan, my survey and report were conducted according to scientifically rigorous methods and industry best practices, using a correct target population, a correct sampling method, correctly designed questions, correctly designed stimuli, correctly designed answer options, and with correct analysis. The results from my survey are thus valid, accurate, and reliable for identifying the perceptions and preferences of the target market for kratom products.

76. As stated in my Declaration, my survey found that only 20.4% of consumers of pain relievers, recreational drugs, herbal supplements, or herbal medicines believed that the MIT45 Kratom extract was habit-forming. In contrast, when shown an edited version of the product that included a warning label, 49.5% of consumers of these products believed that the product was habit-forming. This difference was statistically significant, showing that the disclaimer increases belief that the extract is habit-forming.

77. As stated in my Declaration, my survey found that 62.1% of respondents who would purchase a kratom extract shot would choose to purchase a product that did not indicate that it was habit-forming rather than one that did indicate that it was habit-forming. Thus, the lack of a disclaimer was material to over half of relevant consumers.

78. Respectfully submitted on April 15, 2026 in Wichita, KS

_____

A.  Lynn Matthews, Ph.D.



**PHILLIPS, FRACTOR & COMPANY, LLC**

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

# A. LYNN MATTHEWS, PH.D.

July 2025

## Research Interests

Managerially focused research on branding, with a focus on person-brand management, branding for start-up and small firms, and consumer perceptions of firm behaviors that impact brand perceptions (e.g., CSR, controversy, scandal). I am also interested in mixed methods research, survey and questionnaire-based research, and other issues of methodology.

## Education

Ph.D. 2018    Marketing, University of Nebraska - Lincoln
              Dissertation: "Perceived Authenticity in Human-Branded Services"

M.S. 2013    Survey Research & Methodology, University of Nebraska - Lincoln
              Minor in Marketing

B.A. 2011    Sociology, Grove City College
              Minors in Business, Religion

## Professional Memberships

American Marketing Association (AMA)
American Association for Public Opinion Research (AAPOR)

## Email

lmatthews@rule26.com

3452 East Foothill Blvd. Suite 220
Pasadena, California 91107-3154
T: (626) 744-3540 ‖ O: www.rule26.com



**PHILLIPS, FRACTOR & COMPANY, LLC**

A Limited Liability Company

**Experience**

| Fall 2018 to Present: | Assistant Professor |
|---|---|

Fall 2018 to
Present:
: Assistant Professor
Department of Marketing
W. Frank Barton School of Business
Wichita State University (Kansas)

2012 to Present:
: Consultant
Phillips, Fractor & Company, LLC
Pasadena, CA

2014 Spr & Smr:
2015 Spr & Smr:
2017 Fall:
: Instructor
University of Nebraska – Lincoln

2012 Summer:
: Survey Research Intern
David Nazarian College of Business and Economics
California State University, Northridge

2011 – 2013:
: Gallup Research Scholar
University of Nebraska - Lincoln

2010 – 2012:
: Marketing Research Staff
Center for Computationally Advanced Statistical Techniques (c4cast)
Pasadena, CA

**Courses Taught**

Marketing Research                    Principles of Marketing
International Marketing               Introductory Marketing

A. Lynn Matthews, Ph.D.                    July 2025                    Page 2



**PHILLIPS, FRACTOR & COMPANY, LLC**
A Limited Liability Company

**Publications**

1. "The Importance of Being Important: Measuring Materiality in Consumer Deception Litigation". A. Lynn Matthews, Valerie Flugge, and M. Christine Phillips. *American Business Law Journal*, forthcoming.

2. "Unraveling the Knot of Consumer Reviews: How Stars and Descriptions Impact Purchase Intentions". Stephen A. Hampton, A. Lynn Matthews, and Kalynn Coy. *Journal of Services Marketing*, forthcoming.

3. "How Transfer Behavior Impacts Consumer Perceptions and Intentions Toward College Athletes Who Pursue NIL Activities." A. Lynn Matthews and Jodi E. Pelkowski. *Journal of Sport Management*, 38(5) 365-376.

4. "Sympathy or Shock: How Transgression Diagnosticity Impacts Consumer Perceptions and Intentions Regarding Person-Brands." A. Lynn Matthews and Sarah Leubke. *Journal of Product & Brand Management*, 32( 8): 1399-1411.

5. "Brand Management of Natural Spaces: The Impact of Natural Space Authenticity on Consumer Outcomes." A. Lynn Matthews, Seth Cockrell, and Kristen L. Walker. *Journal of Public Policy & Marketing*, 42(3): 279-295.

6. "Signaling Authenticity for Frontline Service Employees." A. Lynn Matthews and Meike Eilert. *Journal of Services Marketing*, 36(3): 416-431.

7. "Curtain Promises: Draped in Puffery?" William Ingersoll, A. Lynn Matthews, and G. Michael Phillips. *Journal of Case Studies* 39(2): 44-53.

8. "When and How Frontline Service Employee Authenticity Influences Purchase Intentions." A. Lynn Matthews, Meike Eilert, Les Carlson, and Jim Gentry. (2020). *Journal of Business Research*, 114(2020):111-123.

9. "Organizational Learning and Inter-Organizational Knowledge Transfer," in R. Dant and C. Ingene (Eds.) Ravi Sohi and A. Lynn Matthews. *The Handbook of Research on Distribution Channels*. Edward Elgar Publishing 2019.



**PHILLIPS, FRACTOR & COMPANY, LLC**
A Limited Liability Company

10. "What Are You Doing Now? Activity-Level Responses and Recall Failures in the American Time Use Survey."  Tarek Al Baghal, Robert Belli, A. Lynn Phillips, and Nick Ruther.  *Journal of Survey Statistics and Methodology* 2(4):519-537.

11. "Where, Oh Where Have the Vampires Gone? An Extension of the Tiebout Hypothesis to the Undead." In G. Whitman and J. Dow (Eds.).  A.L. Phillips, M. C. Phillips, and G. M. Phillips.  *Economics of the Undead* (pp. 201-210). Lanham, MD: Rowman & Littlefield.

12. *The Quest of the Unaligned*. Mountain Home, AR: Borderstone Press, 2013. (Novel, includes pedagogical discussion and essay questions for use in undergraduate sociology classes)

13. "What's Good in Theory May Be Flawed in Practice: Potential Legal Consequences of Poor Implementation of a Theoretical Sample."  A. Lynn Phillips, G. Michael Phillips, Melanie S. Williams.  *Hastings Business Law Journal* 9(1):77-97.

14. "The Impact of Neighborhood Ethnic Composition on Availability of Financial Planning Services."  James T. Chong, A. Lynn Phillips, G. Michael Phillips.  *Journal of Financial Service Professionals* 65(6):71-83.

15. "The Persistence of Traditional Gender Stereotypes: Evidence from the Distribution of Academic Honors at a Female-Majority University."  A. Lynn Phillips, G. Michael Phillips.  *The American Journal of Business Education* 3(10):45-53.

16. "Homeschooling is an Art, not a Science: The Impact of Homeschooling on Choice of College Major."  A. Lynn Phillips.  *Sociological Viewpoints* 26(2):19-25.

<u>Working Paper</u>

"Naturally Deceptive: The Problem with 'Naturally Flavored' Food Labels".  A. Lynn Matthews and Kristen Walker.  Status: being revised for resubmission to the *Journal of Public Policy and Marketing*.



**PHILLIPS, FRACTOR & COMPANY, LLC**
A Limited Liability Company

**Conference Presentations (**denotes presenter)**

1. "Survey Research In and Out of the Classroom in MKT 403: Marketing Research," in the Conference Roundtable titled, "Community Research Out of the Classroom." AAPOR National Conference, May 2024.

2. "A Three-Pronged Approach to Survey and Questionnaire Design in Wage-Hour and other Labor Litigation Cases." Karina Cordova**, William R. Ingersoll, A. Lynn Matthews**, and G. Michael Phillips. AAPOR National Conference, May 2024.

3. "How to Be Real: Understanding and Assessing Enactment Strategies of Service Provider Authenticity." A. Lynn Matthews and Meike Eilert**. AMS National Conference (Virtual), Dec. 2020.

4. "How to Build Your Reputation: Survey Findings and Implications." A. Lynn Matthews** and Blaine Aikin. Fi360 Conference for Investment Professionals (Virtual), May 2020.

5. "Entrepreneurship in Marketing: A Comprehensive Review of the Literature." A. Lynn Matthews** and Amit Saini. Global Research Symposium on Marketing and Entrepreneurship, August 2017.

6. "… And Here Are Pictures of My Last Vacation! Investigating the Disclosure of Personal Information of Entrepreneurs in Online Marketplaces." A. Lynn Phillips**, Meike Eilert, and James Gentry. Poster, ACR North America Conference, October 2015.

7. "Consumer Perceptions of Controversiality in Business." A. Lynn Phillips** and Meike Eilert. Poster, AMA Public Policy & Marketing Conference, June 2015.

8. "Everyday Consumption and Perceptions of Oldness: Barnhart and Penaloza Extended." A. Lynn Phillips**, James Gentry, and Michelle Barnhart. ACR Latin America Conference, July 2014.

9. "Troubles with Time-Use: Examining Potential Indicators of Error in the ATUS." A. Lynn Phillips**, Tarek al Baghal, and Robert Belli. AAPOR 68th Annual Conference, May 2013.



# PHILLIPS, FRACTOR & COMPANY, LLC
A Limited Liability Company

10. "What Are You Doing Now? Audit Trails and Activity Level Responses and Error in the American Time Use Survey."  T. al Baghal**, A. L. Phillips, N. Ruther, R.F. Belli, L. Stuart, A. Eck, and L-K Soh. AAPOR 68th Annual Conference, May 2013.

11. "Georgia on Their Minds: The Impact of War and Financial Crisis on Georgian Confidence in Social and Governmental Institutions."  A. Lynn Phillips**, Davit Tsabutashvili, and Allan L. McCutcheon. AAPOR 67th Annual Conference, May 2012.

12. "Homeschooling is an Art, not a Science: The Impact of Homeschooling on Choice of College Major."  Pennsylvania Sociological Society 59th Annual Conference, October 2009.

**Awards and Honors**

| | |
|---|---|
| Undergraduate Instructor of the Year, Barton School of Business | 2023 |
| Summer Research Grant, Barton School of Business | 2022, 2023, 2024 |
| Real Estate Research Fellow, Wichita State University | 2018-2020 |
| Dean's Fellowship, UNL College of Business Administration | 2017 |
| Fellowship, American Association of University Women, Lincoln Branch | 2017 |
| UNL College of Business Administration Graduate Student Research Award | 2017 |
| UNL Department of Marketing Award for Excellence in Teaching by a Graduate Student | 2016 |
| UNL Department of Marketing Award for Excellence in Service by a Graduate Student | 2016 |
| Fellow, 2016 Haring Symposium, Indiana University (student presenter) | 2016 |
| UNL Department of Marketing Award for Excellence in Research by a Graduate Student | 2015 |
| Fellow, AMA-Sheth Doctoral Consortium, London Business School | 2015 |
| Doctoral Fellowship, University of Nebraska–Lincoln, Marketing Ph.D. Program | 2013-2018 |
| Graduate Research Assistantship, University of Nebraska– Lincoln, Survey Research and Methodology Program | 2011-2013 |
| Best Undergraduate Paper Award, Pennsylvania Sociological Society | 2009 |

*Recent Testimony of A. Lynn Matthews, Ph.D.*

**Deposition Testimony:**

11/14/2022      Vicki Elder, *et al vs.* Bimbo Bakeries USA, Inc.
United States District Court
Southern District of Illinois, Eastern Division 3:21-cv-00637-DWD

6/23/2023      Charles Strow, *et al vs.* The J.M. Smucker Company / B&G Foods, Inc.
United States District Court
Northern District of Illinois, Eastern Division 1:21-cv-05104

8/25/2023      Lacie Davis, *et al vs.* Ricola USA, Inc.
United States District Court
Central District of Illinois, Springfield Division 3:22-cv-03071

11/16/2023      Kenneth Crawford, *et al vs.* Arizona Beverages USA LLC
United States District Court
Southern District of Illinois, East St. Louis Division 3:22-cv-00220

2/14/2024      Duval Clemmons, *et al vs.* Upfield US Inc.
United States District Court
Southern District of New York, Manhattan 1:22-cv-00355-PKC

4/03/2024      Deniece Drake, *et al vs.* Bayer Healthcare LLC
United States District Court
Southern District of California 3:22-cv-01085-MMA-JLB

4/10/2024      Miguel Frias, *et al vs.* Mars Wrigley Confectionary US LLC
United States District Court
Southern District of New York 1:23-cv-04422-AT

04/15/2024      Marie Falcone, *et al vs.* Nestle USA, Inc.
United States District Court
Southern District of California San Diego Division 3:19-cv-00723-L

05/09/2024      Lisa Bardsley and Andre Haskett *vs.* Nonni's Foods LLC
United States District Court
Southern District of New York 7:20-cv-02979 NSR

05/21/2024      Christina Del Rosario *vs.* Sazerac Company, Inc.
United States District Court
Southern District of New York 1:23-cv-01060-AS

6/06/2024      Deniece Drake, *et al vs.* Bayer Healthcare LLC
United States District Court
Southern District of California 3:22-cv-01085-MMA-JLB

Page 1 of 3

*Recent Testimony of A. Lynn Matthews, Ph.D.*

06/11/2024                Leonard Brockington *vs.* Dollar General Corporation
                          USDC Southern District of New York 1:22-cv-06666

08/09/2024                Shannon Hunt, *et al vs.* The Kroger Co.
and 8/13/24               United States District Court
                          Northern District of Illinois, Eastern Division 1:22-cv-04744

08/15/2024                Joanne Reyes, *et al vs.* Upfield US Inc.
                          USDC Southern District of New York 7:22-cv-06722-KMK

08/30/2024                Sara Feldman, *et al vs.* Wakefern Food Corp.
                          USDC Southern District of New York 7:22-cv-06089-PMH

09/23/2024                Clark Alexandre, *et al vs.* Alcon Laboratories, Inc.
                          USDC Southern District of New York 7:22-cv-08859 (PMH)

10/09/2024                Veronica Shirley, *et al vs.* Reynolds Consumer Products, LLC
                          USDC Northern District of Illinois 1:22-cv-00278

11/15/2024                Lori DeCostanzo, *et al vs.* GlaxoSmithKline PLC, *et al*
                          USDC Eastern District of New York 2:21-cv-04869-NJC-AYS

12/13/2024                Terry Rowland, *et al vs.* Upfield US Inc.
                          Circuit Court for St. Louis County, MO 24SL-CC00138

01/27/2025                Margo Clark, *et al vs.* Blue Diamond Growers
                          USDC Northern District of Illinois, Eastern Division 1:22-cv-01591

03/03/2025                Zulaika Mayfield, *et al vs.* Reynolds Consumer Products LLC
                          USDC Northern District of California, Oakland Division 4:23-cv-04587-JST

04/14/2025                Malachi Mickelonis, Joseph Afilani, *et al vs.* Aspyr Media, Inc.
                          USDC Central District of California 8:23-cv-01220-FWS-ADS

04/21/2025                Sharon Pizarro, *et al vs.* Sazerac Company, Inc.
                          USDC, Southern District of New York 7:23-cv-02751-KMK

04/21/2025                Cindy Koonce, *et al vs.* Sazerac Company, Inc.
                          USDC, Southern District of New York 7:23-cv-04323-UA

2/02/2026                 J.J., C.D., C.B., and D.F., *et al vs.* Ashlynn Marketing Group, Inc.
                          USDC Southern District of California 3:24-cv-00311-GPC-MSB

*Recent Testimony of A. Lynn Matthews, Ph.D.*

3/06/2026            Anaya Washington, et al vs. Reynolds Consumer Products, LLC
                    USDC, Southern District of New York 1:24-cv-02327-ALC-RFT


**Arbitration and Trial Testimony:**

**EXHIBIT 6**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

---oOo---

MARIA MOORHEAD, L.M., D.H.,
and E.L., individually and
on behalf of all others
similarly situated,

                    Plaintiffs,

vs.                              No.  3:24-CV-004990-L-DEB

MIT45, INC.,

                    Defendants.
_____/

REMOTE VIDEOTAPED DEPOSITION OF MARK KEEGAN
RYE, NEW YORK
FRIDAY, MAY 1, 2026

STENOGRAPHICALLY REPORTED BY:
ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~ CSR
LICENSE NO. 9830
JOB NO. 8053625

Page 1

the survey.  So that seems, like, conflicting to me.                 15:44

She's narrowing the scope of the -- of the data to                   15:44

match up with what you say -- sorry.  Let me -- she --               15:44

she is narrowing the scope of the data in the way that               15:44

you state she is not in paragraph 35 of your report.                 15:44

     MR. THOMAS:  Objection; motion to strike;       15:44

argumentative.  Counsel is testifying --                             15:44

     MR. SIRONSKI-WHITE:  Fair enough.            15:44

     MR. THOMAS:  -- there's no question pending.  15:44

     MR. SIRONSKI-WHITE:  Q.  You state that      15:44

she -- in paragraph 35, you state that she includes                  15:44

many respondents who would never purchase -- consider                15:44

purchasing kratom.  And yet, in paragraph 53 of her                  15:44

own report, she excludes precisely those people who                  15:44

would never consider purchasing kratom from the data                 15:44

pool.                                                                15:44

     So how do you square that?                   15:44

   A  Well, we're -- we're apples and oranges here  15:44

in those -- in that comparison.  In fact, we're apples               15:45

and -- and Buicks, actually.  So at -- in my report at               15:45

paragraph 35, I'm talking about the -- an evaluation,                15:45

I'm conducting an evaluation of the universe, the                    15:45

people that the Matthews study considered qualified to               15:45

participate in the study, and I'm saying there briefly               15:45

that the universe is vastly overbroad, that it                       15:45

Page 27

**EXHIBIT 7**

**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Luke Sironski-White (State Bar No. 348441)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com
        lsironski@bursor.com

**LYNCH CARPENTER, LLP**
Todd D. Carpenter (SBN 234464)
todd@lcllp.com
Scott G. Braden (SBN 305051)
scott@lcllp.com
Alexandra R. Stasio (SBN 358410)
alexandras@lcllp.com
9171 Towne Centre Drive, Ste. 180
San Diego, CA 92122
Tel:   (619) 762-1910
Fax:   (858) 313-1850

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA MOORHEAD,, L.M., D.H., and E.L., individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> MIT45 INC., <br><br> Defendant. | Case No. 3:24-cv-00499-L-DEB <br><br> **REPLY DECLARATION OF WILLIAM ROBERT INGERSOLL, PH.D.** |

**REPLY DECLARATION OF WILLIAM ROBERT INGERSOLL, PH.D.**

I, William Robert Ingersoll, Ph.D., declare as follows:

## I.    INTRODUCTION

1.    I am the same William Robert Ingersoll, Ph.D., who executed the Declaration of William Robert Ingersoll, Ph.D., filed on January 8, 2026 in support of Plaintiffs' Motion for Class Certification (the "Initial Declaration"). My qualifications, the methodology I have proposed, and my engagement on this matter are described in the Initial Declaration and are incorporated by reference.

2.    I have been asked to respond to the Declaration of Mr. Matt H. Connors, dated March 19, 2026, submitted by Defendant in opposition to class certification. The compensation paid for my time on this matter remains $500 per hour, regardless of the outcome.

## II.   RESPONSE TO MR. CONNORS

### A.    Mr. Connors' Critiques Address Inputs, Not Methodology

3.    As stated in my Initial Declaration, my engagement was to present a methodology that would be used if it were found that the appropriate measure of restitution is the entirety of the retail price paid by consumers—a "full refund" measure. Initial Decl. ¶¶ 2, 10, 12. The methodology I proposed uses Defendant's own wholesale sales data, applied with a retail markup derived from Defendant's direct-to-consumer pricing and corroborated by third-party retailer pricing, to calculate retail revenues, which would represent total damages under a full-refund measure. *Id.* ¶¶ 13–23.

4.    Mr. Connors critiques are directed to the inputs of the calculation—shrinkage, returns, regional variations in retail markup, and volume discounts—rather than to the validity of the methodology I have proposed. As I explained in the Initial Declaration, the methodology is designed to be refined as additional data becomes available. Initial Decl. ¶¶ 24–25, 27. The factors Mr. Connors raises are precisely the kind of input-level refinements anticipated in my Initial Declaration.

INGERSOLL REPLY DECL.                                   CASE NO 3:24-CV-00499-L-DEB

5.     Mr. Connors' deposition testimony is consistent with this view. He testified that the full-refund methodology is doable and "not impossible" (Connors Tr. 96:1–6); that class-wide calculation is structurally feasible (*id.* at 114:4–8; 145:5–7); that he is "not offering an opinion that class-wide damages couldn't be calculated in this case" (*id.* at 144:8–11); and that his primary dispute is with the inputs rather than with the methodology itself (*id.* at 87:25–88:3). Mr. Connors did not perform an independent damages calculation, and he confirmed that he is "not offering an alternative damages methodology." *Id.* at 144:12–14. To the extent Mr. Connors suggests that the full-refund measure improperly fails to account for any benefits class members may have received, I note that he himself developed no methodology for quantifying any such benefits and calculated no benefits for any plaintiff or class member. *Id.* at 103:15–19.

### B.     Independence of My Analysis

6.     Mr. Connors notes that Dr. Lynn Matthews and I are both affiliated with Phillips, Fractor & Company, LLC. Connors Decl. ¶ 43. That affiliation is correct, but Mr. Connors mischaracterizes its significance. I was not provided with Dr. Matthews' work product in preparation for my Initial Declaration, and I did not rely upon her conclusions in formulating my analysis. We are independent experts who happen to be affiliated with the same firm. The methodology I propose is grounded in Defendant's own sales data and standard economic principles applied to retail-distribution chains. It is not derivative of Dr. Matthews' consumer-perception findings.

7.     To the extent Mr. Connors suggests that I should have integrated Dr. Matthews' work into my analysis, I respectfully disagree. Dr. Matthews' survey addresses materiality. My analysis assumes that liability has been established and presents a methodology for measuring economic losses on that assumption. Initial Decl. ¶ 2. My methodology does not depend on Dr. Matthews' findings, and I would propose the same methodology if her findings were not in the record.

2

### C.   Mr. Connors' Opinions on Class Certification Elements

8.   Mr. Connors devotes a substantial portion of his Declaration to opinions regarding numerosity, commonality, typicality, and adequacy under Federal Rule of Civil Procedure 23(a). Connors Decl. ¶¶ 48–56. I understand these to be legal questions, and Mr. Connors confirmed at his deposition that they are legal conclusions. Connors Tr. 130:18–21. He likewise confirmed that whether full refund or some other measure of restitution applies is "more of a legal question" than an expert one. Id. at 141:5–8. These questions are not within my scope of expertise, and I expressed no opinion on them in my Initial Declaration. My role is limited to providing a methodology for measuring economic losses.

### III.   ALTERNATIVE METHODOLOGIES

9.   As noted in my Initial Declaration, the full-refund methodology is the methodology I was asked to present. Initial Decl. ¶ 10. However, "[t]here are other methodologies that could be used to calculate restitution, depending on the data that actually become available, and/or data that is available from sources that are not MIT45." Id. ¶ 26. For example, a price-premium analysis could be developed if data on appropriately comparable products with disclosure-bearing labels were available, and a restitution-of-profits analysis could be developed using Defendant's profit-and-loss records. As stated in my Initial Declaration, I reserve the right to adjust my analysis as additional information becomes available. Id. ¶ 27.

### IV.   CONCLUSION

10.   The methodology I proposed in the Initial Declaration is appropriate for measuring economic losses on a classwide basis if the trier of fact concludes that full refund is the appropriate measure of restitution. The critiques raised by Mr. Connors address the inputs to that calculation, not the methodology itself, and Mr. Connors confirmed at his deposition that the methodology is doable and that classwide calculation is structurally feasible. Connors Tr. 96:1–6; 114:4–8; 145:5–7. The

---

3

methodology accommodates input-level refinements as additional data becomes available, as anticipated in my Initial Declaration.

11.    My opinions are based on the documents and data referenced in the Initial Declaration, supplemented by my review of the Connors Declaration and Mr. Connors' deposition transcript. I reserve the right to update these opinions as additional information becomes available.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 7 , 2026

William Robert Ingersoll, Ph.D.

INGERSOLL REPLY DECL.                                                    CASE NO 3:24-CV-00499-L-DEB